IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON JENKINS,

    *Plaintiff*,

    v.

SANDRA KURTINITIS, *et al.*

    *Defendants*.

Civil Action No. ELH-14-01346

**MEMORANDUM OPINION**

Plaintiff Brandon Jenkins, who unsuccessfully sought admission to the Radiation Therapy Program at the Community College of Baltimore County ("CCBC"), filed suit against four CCBC employees, in their official and individual capacities, pursuant to 42 U.S.C. § 1983. He alleges violations of the Free Speech Clause ("Count I") and the Establishment Clause ("Count II") of the First Amendment to the United States Constitution, as well as a violation of Article 36 of the Maryland Declaration of Rights (Religious Freedom) ("Count III").  ECF 1.

According to Jenkins, defendant Adrienne Dougherty, Program Director and Coordinator of the Radiation Therapy Program ("RTP") at CCBC, *id.* ¶ 11, violated his rights when she denied him admission to the RTP "on the basis of his expression of religious beliefs and viewpoint" in his admission interview.  *Id.* ¶¶ 24-27, 60.  Jenkins also alleges that defendant Sandra Kurtinitis, President of CCBC, *id.* ¶ 8, and defendants Mark McColloch and Richard Lilley, Vice-Presidents at CCBC, *id.* ¶¶ 9-10, violated his rights by "endorsing and approving" Dougherty's decision.  *Id.* ¶ 61.  Jenkins supplemented his Complaint with four exhibits: an email chain between Jenkins and Dougherty (ECF 9, "Dougherty Chain"); an email chain between Jenkins and Miriam Milsom, another CCBC official (ECF 9-1, "Milsom Chain"); a

demand letter from Jenkins's counsel to Kurtinitis and Dougherty, outlining Jenkins's concerns (ECF 9-3, "Demand Letter"); and CCBC's response, through counsel (ECF 9-2, "CCBC Response").

Now pending is defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 23, "Motion"), supported by a memorandum of law.  ECF 23-1 ("Memo").[1]  Defendants argue that many of Jenkins's claims for relief against defendants in their official capacities are barred by the Eleventh Amendment; that plaintiff fails to allege facts sufficient to push any of his claims from possible to plausible; and that, as to Count III, plaintiff failed to "satisfy conditions precedent" under the Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol.), § 5-304(a) of the Courts & Judicial Proceeding Article ("C.J.").  Plaintiff opposes the Motion (ECF 26, "Opposition"),[2] and defendants have replied.  ECF 27 ("Reply").

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will limit the relief available to plaintiff against defendants in their official capacities, as required by the Eleventh Amendment.  I will grant the Motion, in part, and deny it, in part.

---

[1] Defendants also submitted two letters recommending Jenkins to the RTP.  *See* ECF 23-2.  However, as discussed, *infra*, because defendants filed a motion to dismiss, and not a motion for summary judgment, I have not considered these letters.

[2] Recognizing that because defendants submitted matters outside the pleadings, *see* ECF 23-2 (letters of recommendation), the Court might convert the Motion to one for summary judgment under Fed. R. Civ. P. 12(d), plaintiff filed an affidavit from counsel, pursuant to Fed. R. Civ. P. 56(d), setting out discovery Jenkins believes is needed before the court should rule on summary judgment.  ECF 26-1.  Because I will not convert the Motion, I need not consider plaintiff's request for discovery.

## I. Factual Background

Jenkins alleges that in January 2013 he applied for admission to CCBC's Radiation Therapy Program for the Fall 2013 semester. ECF 1 ¶ 15. It appears from the Complaint that Jenkins was already a student at CCBC when he applied to the RTP. *See id.* ¶ 18 (indicating grades in prerequisite courses without specifying awarding institution). According to Jenkins, CCBC's catalogue describes the program as follows: "'Radiation Therapy utilizes radiation and radioactive isotopes in the treatment of disease, primarily cancer. [A] Radiation Therapist provides services for treatment of malignant and non-malignant disease. [A] Radiation Therapist is responsible for localizing the tumor, implementing the treatment plan, observing and evaluating clinical progress of the patient.'" *Id.* ¶ 17 (alterations in Complaint) (quoting catalogue).[3]

According to Jenkins, "CCBC's admission policy" to the RTP is "based on a three-part point system with the following weighted areas: (1) Prerequisite GPA – 30%; (2) Interview & Observation Day – 40%; and (3) Writing Sample and Critical Thinking Exam – 30%." *Id.* ¶ 20. As to the first weighted area, Jenkins alleges his GPA exceeded the prerequisite GPA. CCBC's catalogue states that the "academic credentials of the most competitive candidates for CCBC's [RTP] include a minimum of 2.5 overall GPA and completion of select courses (including BIOL 109 or BIOL 220 & BIOL 221, MATH 135, PHYS 101 and RTT 101) with a grade of 'C' or

---

[3] CCBC's website states: "Successful completion of CCBC's Radiation Therapy program results in the awarding of an Associate of Applied Science (A.A.S.) degree." *See* CCBC, "Radiation Therapy – Welcome," http://www.ccbcmd.edu/allied_health/radiation/index.html [last accessed on Mar. 16, 2015]. "CCBC Radiation Therapy graduates are eligible to take the American Registry of Radiologic Technologists (ARRT) national registry examination and apply for the Maryland Board of Physicians licensure in radiation therapy." *Id.*

above." *Id*. ¶ 16.  When Jenkins applied, he "had completed each of the required courses and

had obtained the following grade in each course: "B" in BIOL 109, "A" in MATH 135, "C" in

PHYS 101, and "A" in RTTT." *Id*. ¶ 18.  And, he had an overall GPA of 3.2.  *Id*.  As to the

second weighted area, Jenkins alleges that he "scored the maximum points allowed during his

observation." *Id*. ¶¶ 1, 29.  As to the third weighted area, Jenkins states he completed a "writing

sample and critical thinking exam on or about March 21, 2013," and was "invited to interview

with program officials to compete for a spot…." *Id.* ¶ 21.  Jenkins believes that his application

for admission was denied because of comments he made during his admission interview,

discussed, *infra*.

CCBC has a "Nondiscrimination and Equal Opportunity Policy," "published on CCBC's

website," that Jenkins reproduces in his Complaint as follows, *id.* ¶ 14 (emphasis in ECF 1):

**Nondiscrimination and Equal Opportunity**

The Community College of Baltimore County does not discriminate against any
individual for reason of race, sex, color, religion, national or ethnic origin, age,
sexual orientation or conditions of handicap in the admission and treatment of
students, educational programs and activities, scholarship and loan programs,
hiring of faculty and staff, or any terms and conditions of employment.

CCBC recognizes the value of a diverse work force that is reflective of the
students and of the community we serve, and as such, the college is committed to
welcoming, respecting and embracing the differences and similarities of our
employees and our students.

We acknowledge the richness of multiculturalism and diversity.  We hold each
member of the college community responsible and accountable for fostering a
climate of acceptance, inclusion, respect and dignity of all persons.

Jenkins interviewed for admission to the RTP sometime between March 21, 2013, and

April 19, 2013, *see id*. ¶¶ 21, 28, with "a panel of five representatives of CCBC, which included

Defendant Dougherty…." *Id*. ¶ 23.  Jenkins alleges that Dougherty "is responsible for

- 4 -

overseeing and coordinating the processing of applications for the [RTP], academic advising, testing, and evaluation, and admissions to the program." *Id.* ¶ 11.  Jenkins does not identify the other panelists or their roles.  Nor does it appear that the three other defendants attended Jenkins's interview.

Jenkins recounts the details of his interview as follows, ECF 1:

> 23. Mr. Jenkins recalls that during the interview, he was asked what led him to pursue a career in radiation therapy, to which Mr. Jenkins responded that he first considered pursuit of a degree in the medical field following the suggestion of a friend and mentor that his skills made him an ideal candidate for nursing or a similar profession in the medical field.

> 24.  At the time Mr. Jenkins applied … , Mr. Jenkins served as the Director of Harvest House, Inc., a faith-based home for men working to overcome life-controlling problems, whose purpose is to help residents achieve spiritual, emotional, mental, and physical well-being through counseling, mentoring, job and financial training programs, and the development of supportive networks designed to help men set and reach goals, and overcome generational cycles of poverty, lack of education and unemployment.

> 25.  Mr. Jenkins communicated to the panelists that two of his greatest strengths include that he is a "people person" and a "team player."

> 26.  Also during the interview, the panelists asked Mr. Jenkins the broad question, "What is the most important thing to you?"  Mr. Jenkins simply answered, "My God."

> 27.  The panel did not follow up with further questions regarding Mr. Jenkins religious beliefs … .

In his Opposition, plaintiff also states that he "indicated during the admissions process that one of the reasons he was pursuing a career in radiation therapy was 'that God led him to it.'"  ECF 26 at 15 (quoting CCBC Response, ECF 9-2 at 4); *see also* ECF 26 at 22.[4]

---

[4]  Although this statement is not included in the Complaint itself, it is included in defendants' account of Jenkins's interview, as described in CCBC's Response (ECF 9-2). Plaintiff expressly relies on statements in CCBC's Response in his Complaint, *see* ECF 1 ¶¶ 50-

On April 19, 2013, Jenkins received notice that he had not been selected for the RTP. *Id.* ¶ 28. Two days later, on April 21, 2013, Jenkins emailed Dougherty "requesting 'the reason(s) [he] was not chosen" for the RTP. *Id.* ¶ 30 (quoting Dougherty Chain, ECF 9 at 2) (alterations in Complaint). Forty-five minutes later, Dougherty "identified two areas in which Mr. Jenkins scored lower than other candidates: (1) his GPA and (2) his interview." ECF 1 ¶ 33. Dougherty stated that "'there were other students who had higher GPA scores, which [accounts for] 30% of the evaluation process.'" *Id.* ¶ 34 (quoting Dougherty Chain, ECF 9 at 1) (alterations in Complaint). As to the interview, Dougherty said the following, *id.* ¶ 35 (quoting same):

> I understand that religion is a major part of your life and that was evident in your recommendation letters, however, this field is not the place for religion. We have many patients who come to us for treatment from many different religions and some who believe in nothing at all. If you interview in the future, you may want to leave your thoughts and beliefs out of the interview process.

Dougherty's email also stated that "'the other reason [for lost points]'" was Jenkins's "'desire to stay in Maryland,'" given his prior criminal conviction. *Id.* ¶ 36 (quoting Dougherty Chain).

Jenkins alleges that "[e]arly in the admissions process," he had "specifically inquired of Defendant Dougherty whether a single criminal charge he received more than ten (10) years ago would interfere with his ability to obtain a job following completion of" the RTP. ECF 1 ¶ 41. He claims that Dougherty told him another student "had successfully obtained a job in Washington, D.C., despite his criminal record," *id.* ¶ 42, and "that any uncertainty regarding his ability to obtain a job in Maryland would *not* be a reason not to accept him into the program."

---

53, and plaintiff subsequently filed CCBC's Response as a supplement to his Complaint. *See* ECF 9-2 (CCBC Response filed as Supplement to Complaint). I have included the statement here because plaintiff incorporated it into his Complaint and agreed with it in his Opposition.

*Id.* ¶ 43 (emphasis in Complaint).  He also notes that "neither these areas of his past nor Mr. Jenkins's willingness to work outside the State of Maryland following completion of the [RTP] were raised in his admissions interview." *Id.* ¶ 38.

Nonetheless, in Dougherty's email to Jenkins setting forth the reasons she believed he was not selected for the program, Dougherty explained that she "'didn't want'" Jenkins "'to waste 2 years pursuing a career'" he "'won't be able to work in.'" *Id.*  She explained that she "'had seen it in the past,'" and that although "'jobs are opening in the near future, it is primarily through employers in Maryland and it is highly likely these insitiutions [sic] will not hire you based on your past.'" *Id.* (alterations in Complaint).

In the same email, Dougherty did offer "to put [Jenkins] in contact with a director of another department program that might be more suitable for him than the Radiation Therapy Program." *Id.* ¶ 44.  Specifically, she stated, Dougherty Chain, ECF 9 at 1:

> I don't know if you are interested, but our mental health program at CCBC offers a degree and certificate … programs.  Based on your background, current working environment, and your recommendation letters, you would be a great candidate.  I could put you in contact with the director of that program, she is doing … things with it.[5]

Jenkins forwarded Dougherty's email to Miriam Milsom, "Executive Director of CCBC Human Resources," on April 30, 2013.  ECF 1 ¶ 45; *see also* Milsom Chain, ECF 9-1.  He told Milsom that he was "not admitted in part for [his] religion" and stated that he was "not sure what to do seeing that, from what [Dougherty] said in the email, there is no way for [him] to get in now."  ECF 9-1 at 2.  He asked Milsom to "look into the email" and to tell him what she thought

---

[5] The right margin of Dougherty's email is cut-off in the exhibit, so I cannot tell if there is anything between the words "certificate" and "programs" or between "doing" and "things with it."  *See* ECF 9 at 1.

of it.  *Id.*  He also informed her that he was in touch with attorneys at "ACLJ" and that one of them suggested that he "contact someone about the appeals process" while he awaited a response from ACLJ. *Id.*

Further, Jenkins alleges that, "[u]pon information and belief," Jenkins's email to Milsom "was forwarded to the Vice President of Student Services, Defendant Richard Lilley." *Id.* ¶ 46. According to Jenkins, he "never received any response from Defendant Lilley." *Id.* ¶ 47.  The Complaint does not include any other factual allegations supporting Lilley's alleged liability.

Milsom responded to his email of April 30, 2013, by "explain[ing] that she had discussed his complaint with Vice President of Instruction, Mark McColloch, and that 'religion was not a factor in any decision regarding your course of study at CCBC.'"  *Id.* ¶ 48 (quoting Milsom Chain, ECF 9-1 at 1).  The Complaint does not include any other factual allegations supporting McColloch's alleged liability.

On June 28, 2013, Jenkins, through counsel, "and in accordance with Maryland's Local Government Tort Claims Act," sent a letter to Kurtinitis, CCBC President, and Dougherty that "recited the facts regarding the conduct by CCBC and its employees during the admissions and interview process, and informed them that such conduct violated the First Amendment and CCBC's nondiscrimination policy."  *Id.* ¶ 49; *see also* Demand Letter, ECF 9-3.

CCBC, through counsel, responded to Jenkins's letter on July 18, 2013, and, "fully supporting Defendant Dougherty's decision and explanation, denied any wrongdoing and offered additional discriminatory explanation for CCBC's decision not to admit Mr. Jenkins" to the RTP. *Id.* ¶ 50 (citing CCBC Response, ECF 9-2).  In his Complaint, Jenkins points to certain "discriminatory" excerpts from CCBC's Response, such as statements that Dougherty's advice to

"'leave your thoughts and beliefs out of the interview process'" was "'stated bluntly … not bad advice,'" and that "Defendant Dougherty was simply suggesting that Mr. Jenkins 'not wear [his religious views] on his sleeve.'" *Id.* ¶ 51 (quoting CCBC Response, ECF 9-2 at 5) (alterations in Complaint).  He adds:  "CCBC concluded its letter by stating that while Dr. Dougherty's 'words may have been inartfully stated,' they were justified because 'the fact is that in any secular job or program interview it is better to have a concrete reason for wanting to undertake the training at hand than to say only that God directed one to do it.  That is true for every job from astronaut to attorney.'" *Id.* ¶ 53 (quoting CCBC Response, ECF 9-2 at 6).

Jenkins asserts that, as "a result of CCBC's discrimination and retaliation against [him] for his expression of his religious beliefs," he was "unable to receive the proper training and education required at CCBC for a career in radiation therapy;" that he "was deterred from submitting a new application for admission" to the RTP for the Fall 2014 semester; and that he "has suffered, and continues to suffer, economic injury and irreparable harm and is therefore entitled to an award of monetary damages, including punitive damages, and equitable relief." *Id.* ¶¶ 54-56.

Additional facts are included in the Discussion.

## II.  Standard of Review

Defendant's Motion is predicated on Fed. R. Civ. P. 12(b)(6).  A defendant may test the sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Whether a complaint

states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n.3 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly,* 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ⸺ U.S. ⸺, 135 S. Ct. 346, 346 (2014) (per curiam). But, the rule demands more than bald accusations or mere speculation. *Twombly,* 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ⸺ U.S. ⸺, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579

- 10 -

F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).  However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Twombly,* 550 U.S. at 555.  Moreover, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, —— U.S. ——, 132 S. Ct. 1960 (2012).  "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'"  *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted).

Generally, a court's consideration of a Rule 12(b)(6) motion is confined to facts alleged in the operative pleading.  So, a court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).  However, a court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic."  *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir.2014) (quoting *Philips v. Pitt Cnty.*

*Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir.2014). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains,* gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear [ ] on the face of the complaint,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

### III. Discussion

### A. Official Capacity Claims

Plaintiff has sued each of the defendants in both his or her personal and official capacities. *E.g.* ECF 1 at 1. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)) (citations omitted): "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *See also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir.

2012) (treating suit against individuals in official capacity as suit against County).  Thus, official capacity claims are subject to the same immunities the employing entity itself enjoys, such as sovereign immunity under the Eleventh Amendment.  *Graham*, 473 U.S. at 167; *accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Defendants argue that CCBC is an agency of the State of Maryland and therefore plaintiff's claims are barred by the Eleventh Amendment.  They assert that all of plaintiff's claims against them in their official capacities—"to the extent that they seek monetary damages"—must be dismissed because defendants, as State officials, are entitled to sovereign immunity in federal court, and have never waived that protection.  ECF 23-1 at 24.

In his Opposition, plaintiff is critical of defendants' arguments on this point.  But, in the end, plaintiff appears to agree with them.  In his Opposition, plaintiff states, *inter alia*, ECF 26 at 30 (emphasis added):  "[W]hile CCBC is considered an 'arm of the state' entitled to Eleventh Amendment immunity, CCBC officials are not entitled to the same protection when sued in their official capacity for *prospective relief*."

The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  The Eleventh Amendment did not *create* sovereign immunity; rather, it *preserved* the sovereign immunity that the states enjoyed prior to the formation of the Union.  *See Alden v. Me.*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Tex.*, ⸺ U.S. ⸺, 131 S. Ct. 1651, 1657-58 (2011).  For this reason, states enjoy sovereign immunity from private suits brought by their own citizens.

Sovereign immunity precludes a private individual from suing an unconsenting state or an instrumentality of a state (also referred to as an "arm of the state") in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Ct. of Appeals of Md.*, —— U.S. ——, 132 S. Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted)); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). The preeminent purpose of state sovereign immunity is to accord states the dignity that is consistent with their status as sovereign entities. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

However, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to the bar of sovereign immunity, applicable in suits for declaratory and injunctive relief against individual state officers in order to prevent ongoing violations of federal law. *See generally Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Idaho v. Coeur d' Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997); *Edelman v. Jordan*, 415 U.S. 651, 662-65 (1974) (holding that although the Eleventh Amendment permits "prospective relief," it does not permit a "monetary award"); *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010). Of

course, the individual whose conduct is at issue must also qualify as an arm of the state. *Bland*, 730 F.3d at 390. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon*, 535 U.S. at 645 (internal quotation marks omitted).

A state may waive its sovereign immunity. *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). But, there is no contention here of waiver.

It is clear that CCBC is an arm of the State. *See Adams v. Montgomery Coll.*, DKC-09-02278, 2010 WL 2813346, at *4 (D. Md. July 15, 2010) (holding Montgomery County Community College "is a state entity for the purpose of sovereign immunity" under Eleventh Amendment). In *Williams v. Board of Trustees of Frederick Community College*, CCB-03-02123, 2004 WL 45517, at *4 (D. Md. Jan. 8, 2004), Judge Blake observed:

> [A]ll the individual defendants are immune from liability for damages in their official capacities. Because a Maryland community college and its board of trustees are state agencies, *see Samuels v. Tschechtelin*, 135 Md. App. 483, 763 A.2d 209, 230 (Md. Ct. Spec. App. 2000), the Eleventh Amendment precludes an unconsented federal court suit seeking damages or other retrospective remedies against [State] officials. *See*, *e.g.*, *Lewis v. Bd. of Educ. of Talbot County*, 262 F. Supp. 2d 608, 612 (D. Md. 2003); *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995); *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). The only remedy that this court has jurisdiction to impose on these officers in their official capacity is an injunction, if proved appropriate, barring future violations of federal law.

Thus, there is no conflict between defendants' contention that the "claims against the Defendants in their official capacities, to the extent that they seek monetary damages, are barred by the Eleventh Amendment," Memo, ECF 23-1 at 24, and plaintiff's argument that his "official

capacity claims against Defendants are proper and unequivocally actionable," to the extent they seek "prospective relief." Opposition, ECF 26 at 30. These arguments are two sides of the same coin. However, in his prayer for relief, plaintiff seeks, in relevant part, "judgment against Defendants, and … the following relief: … (C) Monetary damages (including punitive damages for Defendants' actions in their individual capacities) in an amount to be determined by the jury; … ." ECF 1 at 17. To the extent that plaintiff seeks a monetary award with respect to his claims against defendants in their official capacities, those claims must be dismissed because such claims are barred by the Eleventh Amendment. *See Edelman*, 415 U.S. at 663-64; *Hutto v. S. Carolina Ret. Sys.*, 773 F.3d 536, 549 (4th Cir. 2014) (citations omitted) ("State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State. Therefore, as did the district court, we hold that the plaintiffs' claim against the state officials for the return of their contributions is barred by the Eleventh Amendment.").

Nevertheless, defendants argue that plaintiff's federal claims against them in their official capacities must be dismissed in their entirety, pursuant to 42 U.S.C. § 1983. According to defendants, dismissal is warranted because they are not "persons" within the meaning of § 1983.

Section 1983 provides a cause of action in federal courts for violation of federal rights by State actors. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Baker v. McCollan*, 443 U.S. 137, 140 (1979). To state a claim under § 1983, a plaintiff must: 1) "allege the violation of a right secured by the Constitution and laws of the United States"; and 2) "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia,* 635 F.3d 634, 639 (4th Cir.), *cert. denied,* ——

U.S. ——, 132 S. Ct. 112 (2011).  Citing *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), defendants argue that "[n]either states nor state officials are 'persons' within the meaning of Section 1983."  ECF 23-1 at 25.

Defendants have accurately quoted *Will*, 491 U.S. at 71.  However, as plaintiff correctly points out, ECF 26 at 23-24, *Will* also states, in a footnote on the same page:  "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official capacity actions for prospective relief are not treated as actions against the State.'"  *Id*. at 71 n.10 (quoting *Graham*, 473 U.S. at 167 n.14).  Accordingly, defendants in their official capacities are "persons" within the meaning of § 1983 with respect to plaintiff's request for prospective relief.

Curiously, defendants have not asked for dismissal of the State claim (Count III) against defendants in their official capacities.  Nevertheless, Count III must be dismissed against all defendants in their official capacities, as barred by the Eleventh Amendment.  The Fourth Circuit has said:  "'[B]ecause of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte*.'"  *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997)).  The Supreme Court has made clear that the Eleventh Amendment entitles state officials sued in their official capacity to immunity from suit in federal court for alleged violations of state law.  *Pennhurst*, 465 U.S. at 106, 111 n.21 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. … We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.");  *accord*, *e.g.*, *Equity In*

*Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 107 (4th Cir. 2011). Accordingly, Count III must also be dismissed as against all defendants in their official capacities.

In sum, plaintiff's federal claims against defendants in their official capacities, to the extent they seek monetary damages or a monetary award, are dismissed, with prejudice. But, plaintiff may seek prospective relief for his federal claims from defendants in their official capacities. And, plaintiff's State-law claim (Count III) will be dismissed as against all defendants in their official capacities, with prejudice.

## B. First Amendment Claims

With regard to Count I, defendants assert that the "lack of facts available to Mr. Jenkins makes it impossible to determine what type of Free Speech claim he is asserting." ECF 23-1 at 16. Defendants then argue that Jenkins's Complaint fails to state a claim for "Free Speech Retaliation." *Id.* In his Opposition, plaintiff does not address defendants' claim of confusion, but argues that his Complaint states a claim for retaliation, ECF 26 at 12-21, *i.e.*, that defendants retaliated against him "for his expression of speech that was protected by the First Amendment" by denying him admission to the RTP. *Id.* at 12-13.

In their Motion, defendants also argue that plaintiff's Complaint fails to state a claim for violation of the Free Exercise Clause. ECF 23-1 at 19. In his Opposition, plaintiff simply responds that he "did not bring a claim under the Free Exercise clause of the First Amendment, nor does he intend to do so at this time." ECF 26 at 22. But, in Jenkins's Complaint, he claims, under either the Free Speech Clause or the Establishment Clause, or both, that the Constitution does not permit an official at a public college to deny admission because of religious expression. *See* ECF 1 ¶ 60 ("Defendant Dougherty unlawfully deprived Plaintiff of his First Amendment

rights in connection with and arising from his application for admission to CCBC's [RTP] by denying Plaintiff admission on the basis of his expression of his religious beliefs and viewpoint."); *id.* ¶ 35 (quoting Dougherty Chain, ECF 9 at 1) ("Defendant Dougherty then listed the reasons why Mr. Jenkins lost points during his interview, offering the following explanation: 'I understand that religion is a major part of your life and that was evident in your recommendation letters, however, this field is not the place for religion. … .'").  Put another way, Jenkins objects to what he claims are unwritten admissions criteria applied by Dougherty and approved by CCBC officials.  *Id.*; *see also id.* ¶¶ 62, 63, 65, 66.

As discussed, *infra*, in Free Speech Clause terms, such a claim is best understood as alleging that CCBC's admissions criteria violate the Clause because they are not content and viewpoint neutral.  In Establishment Clause terms, such a claim is best understood as alleging that CCBC's admissions criteria violate the Clause because they impermissibly give preference to non-religion over religion by expressing disapproval of religion in general, or, in other words, that they are not neutral as between religion and non-religion.

Notably, Jenkins does not allege that CCBC denied his admission because of his particular religious beliefs, or because he belongs to any particular religion, faith, or non-faith community.  Jenkins does not allege, for example, that defendants denied him admission because he believes in God.[6]

---

[6] In Count II of his Complaint, alleging violation of the Establishment Clause, Jenkins does assert that Dougherty's "decision to deny [him] admission to the [RTP] because of his religious expression and beliefs … constitute[s] unlawful disapproval and hostility toward religion."  ECF 1 ¶ 66.  However, this statement does not, in and of itself, allege that defendants denied Jenkins admissions because they disapproved of the only particular religious belief he allegedly expressed, *i.e.*, that his God is "the most important thing to [him]."  ECF 1 ¶ 26.  Rather, the statement, and the overall import of Jenkins's Complaint and arguments in

To be sure, a public college's denial of admission based on disapproval of an applicant's beliefs or affiliation with a particular faith community would be subject to strict scrutiny. *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (applying strict scrutiny to strike down under Free Exercise Clause law enacted to suppress particular religious practice); *Larson v. Valente*, 456 U.S. 228, 244 (1982) (applying strict scrutiny under Establishment Clause to strike down law that facially discriminated between sects).   Indeed, such a decision may not survive even rational basis review under the Equal Protection Clause.  *See Schware v. Bd. of Bar Examiners of New Mexico*, 353 U.S. 232, 238-47 (1957) (holding state Board lacked rational basis, under Due Process and Equal Protection Clauses, for denying plaintiff admission to bar exam and practice of law based on prior membership in Communist Party, labor activism, support of the Loyalists in the Spanish Civil War, use of aliases to hide Jewish heritage, and other evidence of supposed "bad moral character").

With this framework in mind, I will proceed to consider the allegations at hand, *i.e.*, that defendants denied Jenkins admission to the RTP because of the statements he made in his admissions interview that were religious in nature.

### 1. Count I (Free Speech)

The Free Speech Clause of the First Amendment provides: "Congress shall make no law … abridging the freedom of speech … ."  U.S. Const. amend. I.  The Free Speech Clause is made applicable to the States via the Fourteenth Amendment.  *Gitlow v. New York*, 268 U.S. 652 (1925).  "'Premised on mistrust of governmental power, the First Amendment stands against

---

opposition, indicate that Jenkins's concern is that defendants are hostile to "religion" in general, and to the expression of it.  Moreover, even if Jenkins tried to argue that defendants denied him admission because they disapproved of his belief in God, the Complaint does not contain any factual allegations that would support that argument.

attempts to disfavor certain subjects or viewpoints.'"  *ACLU of N. Carolina v. Tata*, 742 F.3d

563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310,

340 (2010)).   Accordingly, governmental "[r]estrictions on speech based on its content are

'presumptively invalid' and subject to strict scrutiny."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S.

353, 358 (2009) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).

Moreover, the Constitution does not permit the government to do indirectly what it could

not do directly.   *See*, *e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996)

(discussing "'unconstitutional conditions' doctrine"); *Frost v. R.R. Comm'n of Cal.*, 271 U.S.

583, 593-94 (1926) ("It is not necessary to challenge the proposition that, as a general rule, the

state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit

to impose.  But the power of the state in that respect is not unlimited, and one of the limitations is

that it may not impose conditions which require the relinquishment of constitutional rights.").

Consequently, the right to free speech "includes not only the affirmative right to speak,

but also the right to be free from retaliation by a public official for the exercise of that right."

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  Although retaliation "is not

expressly referred to in the Constitution, [it] is nonetheless actionable because retaliatory actions

may tend to chill individuals' exercise of constitutional rights."   *ACLU of Md., Inc. v. Wicomico

Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).  "Thus, by engaging in retaliatory acts, public officials

place informal restraints on speech 'allow[ing] the government to produce a result which [it]

could not command directly.'"  *Suarez*, 202 F.3d at 685 (quoting *Perry v. Sindermann*, 408 U.S.

593, 597 (1972) (holding former government employee stated a claim for violation of right to

free speech where he alleged government did not renew his contract because he publicly

criticized school administrators' policies) (alterations in *Perry*) (additional citations omitted)).

"'Such interference with constitutional rights is impermissible.'"   *Suarez*, 202 F.3d at 685

(quoting *Perry*, 408 U.S. at 597).

It is axiomatic that "the protections afforded by the First Amendment … are not absolute

… ."  *Virginia v. Black*, 538 U.S. 343, 358 (2003).   The government, acting as sovereign, may

regulate certain categories of expression "because of their constitutionally proscribable content

(obscenity, defamation, etc.) … ."   *R.A.V.*, 505 U.S. at 383 (emphasis omitted); *see also*, *e.g.*,

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942) ("There are certain well-defined and

narrowly limited classes of speech, the prevention and punishment of which have never been

thought to raise any Constitutional problem.").   And, where the government acts in a non-

sovereign capacity, it may be entitled or even required to consider the content of an individual's

speech in its in decision-making, such as when the government acts as the owner/proprietor of

real property or a conceptually analogous forum, *see Christian Legal Society v. Martinez*, 561

U.S. 661, 679 (2010) ("*CLS v. Martinez*") (citing cases), or as an employer, *see Pickering v.

Board of Education*, 391 U.S. 563, 568 (1968), or as an educator.   *See Bethel Sch. Dist. No. 403

v. Fraser*, 478 U.S. 675, 685 (1986).   In short, the Free Speech Clause "does not leave people at

liberty to publicize their views whenever and however and wherever they please."   *Wood v.

Moss*, ⸺ U.S. ⸺, 134 S. Ct. 2056, 2066 (2014) (citations omitted).

Here, as stated, both sides appear to agree that Jenkins alleges at least a claim for

retaliation under the First Amendment.   *See* ECF 23-1 at 16; ECF 26 at 12-21.   And, in my view,

Jenkins's Complaint also alleges that CCBC has unwritten admissions criteria that discriminate

between applicants based on their viewpoints, in violation of the Free Speech Clause.   Under

either framing, the key question is whether, or to what extent, the comments Jenkins expressed in his admissions interview are protected by the Free Speech Clause.

The parties' arguments on this question can be discerned from their disagreement about the applicable legal standard for Jenkins's retaliation claim. Generally, to state a claim for retaliation, a plaintiff must allege three elements: "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *accord, e.g.*, *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006). Plaintiff argues that *Constantine* sets out the relevant elements of his claim. Opposition, ECF 26 at 13. Defendants rely instead on a specialized standard developed in the context of retaliation claims made by public employees against public employers. ECF 23-1 at 9.

The disagreement about the applicable legal standard reflects the parties' disagreement about how the Court should determine whether Jenkins's speech was protected by the First Amendment. Defendants' proffered precedent protects only speech on a matter of public concern. *See* ECF 23-1 at 9 (citing *Goad v. Silverman*, No. 96-2597, 121 F.3d 698, at *5 (4th Cir. Sept. 5, 1997) (unpub. table decision) (per curiam) (Westlaw)). Plaintiff's proffered precedent begs the question of what speech is protected, by simply requiring a plaintiff to show that she "engaged in protected" speech, under whatever First Amendment doctrine fits the circumstances. *See* ECF 26 at 13 (citing *Constantine*, 411 F.3d at 499). In his discussion of this first element, plaintiff relies largely on cases involving public forums, as discussed, *infra*, to argue that his speech was protected because it was "private religious speech." ECF 26 at 14.

Neither side addresses the material factual differences between this case and the cases they cite.  Clearly, employment-context precedents are not controlling because Jenkins was not a public employee, nor interviewing to be one.  Defendants assert a conclusory argument that "personal answers to interview questions … cannot form the basis of a *First Amendment* retaliation claim … ."  ECF 27 at 7 (emphasis in original).  But, they do not explain why they believe that the Free Speech Clause specially protects answers involving matters of public concern, or, in other words, why such protection strikes the appropriate balance between Jenkins's right to free speech and the government's unarticulated interests.  ECF 23-1; ECF 27.

Similarly, although Jenkins relies on public forum cases, he does not expressly argue that the interview or admissions process constituted a public forum.  *See generally* ECF 26.  He does refer to "the educational context," and states that "[u]niversity students should be free to express viewpoints—including religious perspectives—that are unpopular, unorthodox, or different from those held by school officials."  *Id*. at 14.  And, he observes that his "mention of his belief in God" in the interview "was wholly unrelated to the Radiation Therapy field or his potential work as a therapist."  ECF 26 at 17; *see also id.* at 8 ("Far from relying upon his religion and religious beliefs as components of his qualifications … Mr. Jenkins merely gave authentic answers … .") (citations and alterations omitted).  But, regardless of Jenkins's intent, any reasonable reviewer would believe that statements made by an admissions candidate during an interview are offered in support of the candidate's application.  Usually, that is the point of an interview.  Jenkins cannot take his remarks out of the specific context in which he expressed them by simply asserting that it was "wholly unrelated" to the admissions context.

The Court's research suggests that the case of *Association of Christian Schools International v. Stearns*, 679 F. Supp. 2d 1083 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir.), *cert. denied*, 131 S. Ct. 456 (2010), involves facts that resemble those presented here.  In *Stearns*, the court considered whether the admissions standards of defendant University of California at Berkeley ("UC") violated plaintiffs' rights to free speech.  *Id.* at 1088.  The plaintiffs included a religious school, an association of religious schools, and five students.  *Id.* They alleged that UC impermissibly discriminated based on viewpoint, in violation of the Free Speech Clause, by establishing policies with regard to prerequisite, secondary school courses that were "used to routinely deny courses submitted by religious high schools" for approval as prerequisite courses.  *Id.* at 1088-89.  The plaintiffs, like plaintiff here, relied on public forum cases "as the cornerstone of their argument." *Id.* at 1095.  But, without discussing whether or not the admissions process could be considered a public forum, the court rejected the plaintiffs' analogy.  *Id.*  It relied instead on a number of cases "where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech."  *Id.*  In its view, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (upholding challenge to statutory criteria for competitive selection of arts grantees), provided "the closest parallel to the UC admissions process."  *Id.* at 1097.  In the end, the court applied only rational basis review to UC's admissions standards.  *Id.* at 1098.  The court's analysis was functionally equivalent to rational basis review under the Equal Protection Clause.[7]

---

[7] The court's later discussion of the plaintiffs' Equal Protection Clause claim shows this to be true.  In granting summary judgment for UC on plaintiffs' equal protection claim, the court simply referred back to its rational-basis-review discussion under the Free Speech Clause.  679 F. Supp. 2d at 1112.  Thus, the court regarded its rational basis review under the Free Speech Clause as functionally equivalent to rational basis review under the Equal Protection Clause.  *Id.*

In an unpublished opinion, the Ninth Circuit affirmed the district court's determination that UC's decision to reject certain courses as meeting its standards was "reasonable and did not constitute viewpoint discrimination."   362 F. App'x 640, 645 (9th Cir. 2010).   The court reasoned, in part, *id.* at 643:

> The Supreme Court has rejected heightened scrutiny where, as here, the government provides a public service that, by its nature, requires evaluations of and distinctions based on the content of speech.  *See United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 203-208 (2003) ("ALA"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580-87 (1998); *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673-74 (1998).   As a university, one of UC's "essential freedoms" is to "determine for itself on academic grounds ... who may be admitted to study."  *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).   UC exercises that freedom by reviewing high school courses to ensure that they adequately prepare incoming students for the rigors of academic study at UC.

In sum, in the context of this case, I have before me three categories of cases pertinent to the Free Speech Clause analysis: employment-context cases, relied on by the defendants, ECF 23-1; public forum cases, ECF 26, on which plaintiff relies; and cases "where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech."  *See Stearns*, 679 F. Supp. 2d at 1095; *aff'd*, 362 F. App'x at 643.  I will first consider plaintiff's public forum cases, then the cases identified in *Stearns*, then the employment-context cases on which defendants rely.

### a. Public Forum Cases

So-called "public forum" cases involve challenges by plaintiffs to government decisions denying them access to "forums."  In most cases, the forums at issue are inside real properties owned by the government.  "Recognizing that the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully

dedicated," the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

The Supreme Court has distinguished three different kinds of public forums— traditional, designated, and limited.[8] *CLS, supra*, 561 U.S. at 679 n.11; *see also Pleasant Grove v. Summum*, 555 U.S. 460, 469 (2009) (defining traditional public forum, designated public forum, and "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects"). Strict scrutiny applies to content-based decisions regarding access to traditional or designated forums. *CLS*, 561 U.S. at 679 n.11. But, content-based denials of access to limited public forums may be permitted if they are "reasonable and viewpoint neutral." *Id*. at 697.

The Court has also applied public forum doctrine to cases involving "certain … government programs that share essential attributes of a traditional public forum" but may not involve government property. *Pleasant Grove*, 555 U.S. at 469; *see also, e.g., Child Evangelism*

---

[8] The Court has also described certain forums as "nonpublic." *See, e.g., Cornelius*, 473 U.S. at 814 (stating that cases have "divided public property into three categories—public forums, limited public forums, and nonpublic forums"). It is not clear what, if any, difference there is between a "nonpublic" and a "limited public" forum in more recent cases. *See, e.g, Rosenberger*, 515 U.S. at 829 (discussing "limited" public forums and citing *Cornelius* discussion of "nonpublic" forums); *see also Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067-68 (4th Cir. 2006) (discussing "nonpublic forums"). In keeping with the Supreme Court's latest discussion of this issue, I will refer only to traditional, designated, and limited public forums.

*Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067-68 (4th Cir. 2006) ("Where the state encourages private speech by making funds available, the money constitutes a forum "more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable.") (quoting *Rosenberger*, 515 U.S. at 830); Aaron H. Caplan, "Stretching the Equal Access Act Beyond Equal Access," 27 SEATTLE U. L. REV. 273, 353 (2003) (considering "how public forum doctrine functions when applied to "(a) governmental communications media, (b) private property, (c) government programs with incidental communicative elements, (d) government money, and (e) government speech").

As stated, Jenkins argues in his Opposition that he engaged in protected speech because it was "private religious speech."  He asserts that his "speech, expressed in his capacity as an applicant to CCBC's Radiation Therapy Program, constituted private speech[,]" and the "nature" of his speech was "religious."  ECF 26 at 14-15.  He concludes: "As private religious expression, Mr. Jenkins's speech enjoys full protection under the First Amendment."  *Id*. at 15.

Jenkins relies almost entirely on public forum cases in support of this argument.  He quotes *Capitol Square Review & Advisory Board v. Pinette*, 515 U.S. 753, 760 (1995), as follows, ECF 26 at 14 (alteration omitted):

> Private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression.  Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.

Jenkins then cites the four cases cited after the quoted excerpt in *Pinette*.  *See* ECF 26 at 14 (citing *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993); *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226 (1990); *Widmar v. Vincent*, 454

U.S. 263 (1981); *Heffron Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 263 (1981)).  All

of these are public forum cases.[9]  Jenkins also cites *Keyishian v. Board of Regents*, 385 U.S. 589,

603 (1967), a case brought by public university employees challenging conditions of their

employment, for the proposition that the "vigilant protection of constitutional freedoms is

nowhere more vital than in the community of American schools."  *See* ECF 26 at 14.

Plaintiff provides no discussion of *Pinette* or why he believes it applies to the facts here.

*See id.*  And, it is not obvious what he means to say.  In context, the excerpt plaintiff quotes

simply reaffirms the Court's prior rejection of arguments that speech in the form of "religious

proselytizing" or "worship" is per se unprotected by the Free Speech Clause.  *See Pinette*, 515

U.S. at 760.[10]  Here, defendants do not argue that Jenkins speech was unprotected because it was

religious in nature.  *See*, *e.g.*, ECF 27 at 7.  Rather, they argue that it was not protected because it

was a "personal answe[r] to [an] interview question."  *See id.*  At best, plaintiff's argument

---

[9] More specifically, *Mergens* involved a challenge under the Equal Access Act, codified at 20 U.S.C. §§ 4071-74.  *Mergens*, 496 U.S. at 231.  In 1984, by passing the Equal Access Act, "Congress extended the reasoning of *Widmar* to public secondary schools."  *Id.* at 235.  In *Widmar*, 454 U.S. 263, the Court held that a public university violated students' rights to free speech when it denied them access to school facilities "generally available for the activities of registered student groups" because the students wished to "use the facilities for religious worship and religious discussion," without an overriding, compelling interest in denying the students access.  *See id.* at 264-65, 269-76.

[10] Immediately following the excerpt quoted by Jenkins, the Court said, *id.* at 560: "Accordingly, we have not excluded from free-speech protections religious proselytizing, *Heffron, supra,* at 647, or even acts of worship, *Widmar, supra,* at 269, n.6.  Petitioners do not dispute that respondents, in displaying their cross, were engaging in constitutionally protected expression."  The note in *Widmar* cited in *Pinette* says, in part, 454 U.S. at 269 n.6:  "The dissent argues that 'religious worship' is not speech generally protected by the 'free speech' guarantee of the First Amendment and the 'equal protection' guarantee of the Fourteenth Amendment.  If 'religious worship' were protected 'speech,' the dissent reasons, 'the Religion Clauses would be emptied of any independent meaning in circumstances in which religious practice took the form of speech.' …  There are at least three difficulties with this distinction. … ."

advances the uncontroverted point that the Free Speech Clause generally prohibits content-based regulation of any kind, including regulation of religious content per se.  But, plaintiff leaves completely unaddressed the larger question of whether the government's decision, under the circumstances here, was subject to the Free Speech Clause's general prohibition on content-based and viewpoint-based regulation at all, or, put another way, whether his speech was protected by that prohibition.

Plaintiff's reliance on public forum cases suggests he believes that his speech was protected because it was expressed in some sort of public forum.  But, as stated, he does not actually argue that defendants created any kind of public forum, or that Jenkins's speech was expressed in a traditional public forum.  ECF 26.  And, nothing in his Complaint plausibly shows that CCBC created even a limited public forum when it accepted applications for admission to the RTP program.  Indeed, it shows the opposite.

Significantly, plaintiff alleges that the admissions process was "competitive."  *See*, *e.g.*, ECF 1 ¶ 16 ("According to CCBC's college catalog, the academic credentials of *the most competitive candidates*" for the RTP "include *a minimum* of 2.5 overall GPA and completion of select courses … with a grade of 'C' or above.").  He argues, in effect, that he should have been admitted because his GPA "exceeded the GPA criteria of *a competitive candidate* for the program," *id*. ¶ 18 (emphasis added), he completed the writing sample and critical thinking portions, *id.* ¶ 19, and he scored "the maximum points allowed on the observation portion of the interview day … ."  *Id.* ¶ 20.  But, he does not allege that CCBC held admission to the RTP generally open to anyone who met those same criteria.

This fact alone distinguishes Jenkins's case from the public forum cases on which he relies.  *See*, *e.g*, *Lamb's Chapel*, 508 U.S. at 390 (holding public school violated Free Speech Clause when it denied church congregants access to school facilities that were generally held open to the public because of viewpoint expressed in plaintiffs' planned activity); *Widmar*, 454 U.S. at 269 (holding public university "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion"); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) (holding public university violated students' rights to free speech when it withheld funding generally available for activities "related to the educational purpose of the University" from students publishing literature with religious viewpoint because of literature's religious viewpoint).

In considering whether the government has established a limited public forum, the key distinction is whether or not the government holds the forum *generally open* to certain subjects and/or speakers, based only on some otherwise neutral criteria, such as compliance with reasonable time, place, and manner restrictions.  *See*, *e.g.*, *Perry Educ. Ass'n*, 460 U.S. at 47 (holding school district's internal school mail system was not a public forum, and reasoning that if "by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created"); *Greer v. Spock*, 424 U.S. 828, 838 n.10 (1976) (explaining that military's occasional invitation to civilian speakers and entertainers to speak at military base did not convert base into public forum).  Nothing in the Complaint plausibly shows that CCBC held admission to the RTP generally open to anyone who met a certain set of stated criteria.

As noted, plaintiff alleges that the admissions process was "competitive." *See*, *e.g.*, ECF 1 ¶¶ 16, 18.  And, plaintiff does not dispute CCBC's authority to choose some candidates and not others for enrollment in the limited spots available in the RTP.  *See generally* ECF 26.  In other words, he is not saying that CCBC promised non-competitive admissions, or that CCBC was required to provide noncompetitive admissions.  Given the competitive nature of the process, and defendants' authority to competitively select students, some form of permissible content-based, and even viewpoint-based, discrimination is inherent in CCBC's consideration of every student's application for admission to the RTP.  *See Stearns*, 362 F. App'x at 643 (considering Free Speech challenge to public university admissions standards) ("The forum cases are simply inapposite.").  This must also be true for the statements plaintiff made in his admission interview.

Would plaintiff argue that defendants violated his right to free speech if they denied him admission because he said, in his interview, that he wants to avoid treating adults with cancer?  That certainly would be a good reason to deny him admission to a program that trains students to treat all people with cancer.  Defendants must be able to take such a "viewpoint" into consideration when choosing between candidates for competitive admission.  Plaintiff's proposed standard, however, would turn a denial of admission on those facts into a constitutional violation.

Accordingly, I am not persuaded that this is a public forum case, or that the public forum precedents plaintiffs cites are at all helpful to him.  Rather, as stated above, this situation is more like those in which "the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech."  *See Stearns*, 679 F. Supp. 2d at 1095.

**b.** *Stearns*

As discussed in *Stearns*, *supra*, 679 F. Supp. 2d 1083, the District Court for the Central District of California (Otero, J.) relied on precedents involving situations "where the government is providing a public service that by its nature requires evaluations of, and distinctions based upon, the content of speech" to find that rational-basis review applied to a public university's admissions standards. *Id.* at 1095, 1098 (citing *United States v. Am. Library Ass'n,* 539 U.S. 194, 204-05 (2003); *Finley*, 524 U.S. at 580; *cf. Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 672-73 (1998)); *see also Stearns*, 362 F. App'x at 643 ("The Supreme Court has rejected heightened scrutiny where, as here, the government provides a public service that, by its nature, requires evaluations of and distinctions based on the content of speech.").  In particular, Judge Otero found *Finley*, 524 U.S. 569, most helpful.  *Sterns*, 679 F. Supp. 2d at 1097.

In *Finley*, plaintiff-petitioners challenged a provision of the National Foundation on the Arts and the Humanities Act of 1965, as amended in 1990, and codified at 20 U.S.C. § 954(d)(1), which required the National Endowment for the Arts ("NEA") "to ensure that 'artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.'"  524 U.S. at 572 (quoting § 954(d)(1)).  Petitioners argued "that the provision is a paradigmatic example of viewpoint discrimination because it rejects any artistic speech that either fails to respect mainstream values or offends standards of decency."  524 U.S. at 580.  The Supreme Court said that "the considerations that the provision introduces, [regarding decency and excellence,] by their nature, do not engender the kind of directed viewpoint discrimination that would prompt this Court to invalidate a statute on its face."  *Id*. at 583.  Further, it stated that

any other "content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding." *Id*. at 585.

The Court reasoned, 524 U.S. at 585-86 (some citations omitted):

> The NEA has limited resources, and it must deny the majority of the grant applications that it receives, including many that propose "artistically excellent" projects.  The agency may decide to fund particular projects for a wide variety of reasons, "such as the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form."  Brief for Petitioners 32.  As the dissent below noted, it would be "impossible to have a highly selective grant program without denying money to a large amount of constitutionally protected expression."  The "very assumption" of the NEA is that grants will be awarded according to the "artistic worth of competing applicants," and absolute neutrality is simply "inconceivable."

The nature of this work, the Court stated, set *Finley* "apart" from the public forum case plaintiffs primarily relied upon, *Rosenberger*, *supra*, 515 U.S. 819, in which the government created a funding pool that was open to all students on a non-competitive basis, but then denied certain students access based on the viewpoints they expressed.  *Finley*, 524 U.S. at 586.  In *Rosenberger*, the funding pool was a limited public forum.  *Id*.  In *Finley*, however, the funding pool was not a limited public forum, or any sort of public forum, because of "the competitive process according to which the grants are allocated."  *Id*. ("The NEA's mandate is to make esthetic judgments, and the inherently content-based 'excellence' threshold for NEA support sets it apart from the subsidy at issue in *Rosenberger*—which was available to all student organizations that were "'related to the educational purpose of the University'" … .").

The Court determined that the statute at issue did not violate the Free Speech Clause because "the Government may allocate competitive funding according to criteria that would be

impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 587-88.

The Court drew an analogy to *Rust v. Sullivan*, 500 U.S. 173 (1991), in which it upheld a federal

regulation that "forbade the use of appropriated funds in programs where abortion is a method of

family planning." *Id.* at 191.  The *Finley* Court explained, 524 U.S. at 588:

> [A]s we held in *Rust*, Congress may "selectively fund a program to encourage
> certain activities it believes to be in the public interest, without at the same time
> funding an alternative program which seeks to deal with the problem in another
> way." 500 U.S., at 193.  In doing so, "the Government has not discriminated on
> the basis of viewpoint; it has merely chosen to fund one activity to the exclusion
> of the other." *Id.*; *see also Maher v. Roe,* 432 U.S. 464, 475 (1977) ("There is a
> basic difference between direct state interference with a protected activity and
> state encouragement of an alternative activity consonant with legislative policy").

*Finley* also cautioned that it "had no occasion," on the facial challenge presented, "to

address an as-applied challenge in a situation where the denial of a grant may be shown to be the

product of invidious viewpoint discrimination." *Id*. at 587.  It added:  "If the NEA were to

leverage its power to award subsidies on the basis of subjective criteria into a penalty on

disfavored viewpoints, then we would confront a different case." *Id.*  But, the Court did not go

on to say what kind of case it would confront, *e.g.*, a Free Speech or Equal Protection case.

As previously stated, in *Stearns* the court determined that the question of whether public

university admissions standards are susceptible to claims of viewpoint discrimination under the

Free Speech Clause is best decided under the logic of *Finley*.  Judge Otero reasoned, 679 F.

Supp. 2d at 1095-98 (some citations and footnote omitted):

> [N]ot all content-based regulations are subject to strict scrutiny.  The Supreme
> Court has repeatedly rejected a heightened standard where the government is
> providing a public service that by its nature requires evaluations of, and
> distinctions based upon, the content of speech.

\*\*\*

In *National Endowment for the Arts v. Finley*, the Supreme Court held that a government agency could make aesthetic judgments in allocating competitive funding for art projects that demonstrated 'excellence.'  524 U.S. at 586.  After all, determinations of 'excellence' are 'inherently content-based.'  *Id.*  Because limited funding was allocated according to a competitive process, the Supreme Court specifically noted that reliance on *Rosenberger* [*supra*] was 'misplaced.'  *Id.*

*** 

The distribution of grants in *Finley* is the closest parallel to the UC admissions process.  In both scenarios, the government is providing a public benefit that is allocated to a limited number of persons through a competitive process.  Like the government agency that must judge the excellence of prospective art projects, UC must judge the excellence of prospective students who apply for a guaranteed spot at UC.

*** 

Accordingly, the [defendant's] Policies must be analyzed under *Finley*, while heeding the Supreme Court's warning … that judicial forays into the exercise of discretion are problematic.  Heightened scrutiny is inappropriate here.  If the [defendant's] Policies are rationally related to the goal of selecting the most qualified students for admission, they do not violate the First Amendment's guarantee of free speech.

Here, as in *Stearns*, *Finley* provides a close parallel to the facts presented.  "Like the government agency that must judge the excellence of prospective art projects," CCBC "must judge the excellence of prospective students who apply for" admission to its Radiation Therapy Program. *See Stearns*, 679 F. Supp. 2d at 1097.  "In both scenarios, the government is providing a public benefit that is allocated to a limited number of persons through a competitive process." *Id*.  As in *Finley* and *Stearns*, and as discussed above in relation to the public forum cases plaintiff cited, some form of permissible content-based, and even viewpoint-based, discrimination is inherent in CCBC's consideration of every student's application for admission.  Therefore, claims of viewpoint discrimination under the Free Speech Clause will not lie.  *See also*, *e.g.*, *Am. Library Ass'n*, 539 U.S. at 206-08, 214 (holding that public library's mission "to

facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality" permits it to make "quality-based judgments about … the material it furnishes" without violating "patrons' First Amendment rights"); *Forbes*, 523 U.S. at 673 (reiterating that "[p]ublic and private broadcasters alike are note only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming").

In *Stearns*, as part of its Free Speech Clause analysis, after determining that "heightened scrutiny" did not apply, the court went on to consider whether UC's standards were reasonably related to the government's goals, and whether they were the product of animus.  679 F. Supp. 2d at 1095.  And, as discussed, *supra*, the court's analysis on this point appears to have been identical to rational basis review under the Equal Protection Clause.  *See* Note Seven.

However, under the Free Speech Clause, it does not appear that *Finley*, or the other cases cited by the court in *Stearns*, necessarily call for rational basis review or a search for invidious viewpoint discrimination.  *Compare Finley*, 524 U.S. at 587 (stating that facts showing "invidious viewpoint discrimination" would raise "a different case") *with  Stearns*, 679 F. Supp. 2d at 1095 ("[T]hese regulations are constitutional if they are reasonably related to the government's goal of providing the public service and are not the product of government animus."); *id*. at 1095 n.9 ("[T]he government may not use otherwise lawful regulations to purposefully suppress a politically disfavored viewpoint.").  Constitutional protection against arbitrary government decisionmaking, and against "invidious discrimination," flows from the Equal Protection Clause of the Fourteenth Amendment, not the Free Speech Clause of the First Amendment.  *See*, *e.g.*, *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 489 (1955)

("The prohibition of the Equal Protection Clause goes no further than … invidious discrimination."); *Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013) ("[The Equal Protection Clause] requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals.") (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985) [(holding that municipal decision to deny a permit for operation of group home for "the mentally retarded" failed rational basis review where it "appear[ed]" to the Court that the decision "rest[ed] on an irrational prejudice against the mentally retarded.")]).

Jenkins has not claimed a violation of the Equal Protection Clause. Accordingly, I need not consider whether defendants' actions are reasonably related to a legitimate goal or the product of animus.

Moreover, although for the reasons just discussed in Parts A and B, the Free Speech Clause does not prohibit content-based or viewpoint-based decisionmaking in competitive admissions processes, that does not mean that the Free Speech Clause does not in other ways protect speech expressed in the context of admissions interviews. Drawing on employment-context precedents, defendants argue, in effect, that a form of heightened scrutiny applies when the speech involves a matter of public concern. *See* ECF 23-1 at 16-17.

### c. Employment-Context Cases

Pursuant to *Pickering v. Board of Education*, 391 U.S. 563 (1968), a distinct body of precedent has developed addressing speech-retaliation claims in the public employment context. *See*, *e.g.*, *Connick v. Myers*, 461 U.S. 138, 142 (1983). These cases implement *Pickering*'s directive to balance "the interests of the [employee], as a citizen, in commenting upon matters of

public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" when considering alleged violations of employees' rights to free speech.  *Pickering*, 391 U.S. at 568. Although these cases show that "government employees do not lose their constitutional rights at work," they also show that when the government acts as an employer against an employee, it "may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

*Pickering* carved out speech on "matters of public concern" as warranting special protection because of the great importance of such speech in a democratic society.  391 U.S. at 571-72; *see also Lane v. Franks*, ⸺ U.S. ⸺, 134 S. Ct. 2369, 2379-80 (2014).  Generally stated, the *Pickering* Court reasoned that public employees, such as teachers like Pickering, "are, as a class, the members of a community most likely to have informed and definite opinions" about certain questions of public importance that are left to "popular vote," such as school funding.  *Id.*  "Accordingly," the Court concluded, "it is essential that" public employees "be able to speak out freely on such questions without fear of retaliatory dismissal." *Id*. at 572.  This protection furthers the "public interest in having free and unhindered debate on matters of public importance." *Id*. at 573 (citing, *e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).

In arguing that plaintiff failed to state a claim for free speech retaliation, defendants rely on a case that is, for all intents and purposes, an employment-context case. *See* ECF 23-1 at 9 (citing *Goad v. Silverman*, No. 96-2597, 121 F.3d 698, at *5 (4th Cir. Sept. 5, 1997) (unpub. table decision) (per curiam) (Westlaw)).  In *Goad*, plaintiff sued the Medical College of Virginia

of the Virginia Commonwealth University ("MCV") for "dismissing him from the psychiatry residency program." *Id*. at *4. Plaintiff alleged, *inter alia*, that MCV dismissed him in retaliation for religious views he frequently expressed on "homosexuality and religion." *See id*. at *1, 5. Citing *Huang v. Board of Governors*, 902 F.2d 1134 (4th Cir. 1990) (involving retaliation claim against university brought by tenured professor), the Court stated that plaintiff had to "satisfy the following three elements to establish a First Amendment retaliation claim," *id*. at *5:

> [F]irst, [plaintiff] must show that his speech related to matters of public concern; second, [plaintiff] must show that the alleged retaliatory action deprived him of some valuable benefit; and third, [plaintiff] must demonstrate a causal relationship between his speech relating to a matter of public concern and the retaliatory action.

I assume that defendants rely on *Goad* because the plaintiff in *Goad* was a medical resident, and, as such, had a hybrid student/employee role within the University, somewhat similar to that of a clinical student, like Jenkins hoped to be. *See*, *e.g.*, Dougherty Chain, ECF 9 at 1 (referencing work performed by RTP students with patients). But, I am not persuaded that *Goad* itself provides useful precedent here, for two reasons.

First, the decision does not characterize Goad as either a student or an employee. It contains many indications that Goad played a student-like role inside the University. It states, for example, that he was dismissed before he could "graduate," *id*. at *3, and discusses his behavior "[d]uring the course of his studies." *Id*. at *1. But, in other legal contexts, medical residents have been considered more like employees than students. *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 59 (2011) (upholding Department of Treasury's "full-time employee rule," which classified hospital's medical residents as employees, rather

than students, for tax purposes).  And, because Goad also brought suit for wrongful termination, he may not have disputed the application of an employment-context case to his retaliation claim. 121 F.3d 698, at *4.

Second, the *Goad* Court assumed, without deciding, that plaintiff's speech was protected by the Free Speech Clause.  *Id*. at *5, *5 n.6.  It decided the case on the question of causation. *Id*. at *6.  The causation element is the same in both the general retaliation test, *see Constantine*, 411 F.3d at 499 (citing *Suarez*, 202 F.3d at 686 (citing *Huang*, 902 F.2d at 1140)), and the employment-specific test.  *See*, *e.g.*, *Huang*, 902 F.2d at 1140.  Consequently, the court did not have to decide whether Goad was more like an employee or a student, or in what way the Free Speech Clause did or did not protect his speech based on his relationship to the government.

Thus, *Goad* is not helpful because the Court appears to have treated Goad more like an employee than a student, which makes that case more like other employment-context cases than the one here.  Moreover, because the Court assumed Goad's speech was protected, the little it said relevant to the question at hand— whether Jenkins's speech was protected— is dicta.

Otherwise, as stated, defendants have not explained why what is often called the *Pickering-Connick* balancing test should be extended to the admissions context.  The Supreme Court has extended the *Pickering-Connick* balancing test to situations where the government acts as contractor vis-à-vis independent contractors.  *Umbehr*, *supra*, 518 U.S. 668.  And, lower courts have applied it to analogous situations.  *See*, *e.g.*, *Blackburn v. City of Marshall*, 42 F.3d 925, 932-34 (5th Cir. 1995) (collecting cases).[11]  Generally, however, courts have declined

---

[11] In *Blackburn*, the Fifth Circuit identified a number of cases brought by medical staff who worked inside public hospitals, but who were not "salaried public employees," where courts

invitations to apply the *Pickering-Connick* test where the government's role is not closely analogous to that of an employer. *See*, *e.g.*, *Bridges v. Gilbert*, 557 F.3d 541, 550 (7th Cir. 2009) (refusing to apply where government acting as warden); *CarePartners, LLC v. Lashway*, 545 F.3d 867, 880 (9th Cir. 2008) (refusing to apply where government acting as licensor of assisted-living boarding homes); *Van Deelen v. Johnson*, 497 F.3d 1151, 1156–57 (10th Cir. 2007) (refusing to apply where government acting in law-enforcement capacity); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 767 (9th Cir. 2006) (refusing to apply where government acting as educator disciplining students). Here, defendants have not explained how their interests in this case, as school officials considering applicants for a competitive clinical program, are like the interest of an employer in the efficient performance of public services.

That said, *Pickering*'s special protection of speech on a matter of public concern, even where the government otherwise has wide latitude to attach consequences to an individual's speech, is instructive. As discussed, *infra*, I agree with *Stearns*, 679 F. Supp. 2d at 1095, that admissions decisions to competitive programs at public institutions of higher education are not susceptible to viewpoint-discrimination claims because such decisions, by nature, require "evaluations of, and distinctions based upon, the content of speech." But, the "public interest in having free and unhindered debate on matters of public importance," *Pickering*, 391 U.S. at 573, may command some form of heightened scrutiny of decisions based on an applicant's speech on a matter of public concern. *See also*, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1215 (2011) (reiterating that speech on matters of public concern is "at the heart of the First Amendment's protection" because such speech "is the essence of self-government"); *Forbes*,

applied the *Pickering-Connick* test based on the "quasi-employment relationship" presented. *Id.* at 932-33.

523 U.S. at 675 (finding that "[a]lthough public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine, candidate debates present the narrow exception to the rule," in part because of their "exceptional significance in the electoral process"); *New York Times Co.*, 376 U.S. at 280 (holding Free Speech Clause requires application of "actual malice" standard to libel claim where speech involves criticism of public officials); *cf. Cottone v. Marcus*, 93-CV-6439L, 1995 WL 819034, at *10 (W.D.N.Y. Apr. 5, 1995) (report & recommendation) (suggesting that where defendants denied plaintiff re-admission to a public university program, plaintiff needed to show his speech was "on a matter of public concern" to allege free speech retaliation claim).

For example, imagine there exists a public college that, based on the applicant pool, tends to enroll students with liberal political views. Two otherwise comparable applicants express contrary views on a matter of public concern in their personal essays, one from a conservative political perspective and one from a liberal perspective. Could that college choose the candidate who expressed conservative views over the one who expressed liberal views, for that reason alone, in furtherance of its compelling interest to create a diverse student body? *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-12 (1978) ("The fourth goal asserted by petitioner is the attainment of a diverse student body. This clearly is a constitutionally permissible goal for an institution of higher education. Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment. The freedom of a university to make its own judgments as to education includes the selection of its student body."); *accord, e.g., Fisher v. Univ. of Texas*, ⸺ U.S. ⸺, 133 S. Ct. 2411, 2418

(2013).   Under the same circumstances, could that college favor the candidate with liberal views, for any reason, consistent with the Constitution?

Of course, I need not decide such a question in this case.   Nor must I decide whether heightened scrutiny applies to admissions decisions based on speech on a matter of public concern, because Jenkins's speech was not on a matter of public concern.   In *Durham v. Jones*, 737 F.3d 291, 299-300 (4th Cir. 2013) (citations omitted), the Fourth Circuit described the public concern element in employment-context cases as follows:   "The Supreme Court has instructed courts to look to the content, form, and context of a given statement to determine whether it addresses a matter of public concern.   Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community."   *See also Snyder*, 131 S. Ct. at 1216.

Plaintiff himself expressly argues in his Opposition that the speech at issue was "private" speech.   ECF 26 at 14.   I agree.

According to the Complaint, the speech at issue was Jenkins's two-word response, "My God," to an interview question that asked him: "'What is the most important thing to you?'" ECF 1 ¶ 26 (ostensibly quoting interviewers).   In his Opposition, plaintiff added that he "indicated during the admissions process that one of the reasons he was pursuing a career in radiation therapy was 'that God led him to it.'"   ECF 26 at 15 (quoting CCBC Response, ECF 9-2 at 4).   The content of the speech, in both instances, says nothing about "an issue of social, political, or other interest to a community."   *See Durham*, 737 F.3d at 300; *see also* Memo, ECF 23-1 at 17 (arguing Jenkins's speech was "a matter of 'personal interest,' apparently made in an

effort to secure Mr. Jenkins's own admission to the Program.  It did not relate to any other applicants, nor was it made to challenge a broader CCBC policy").

Accordingly, for the foregoing reasons, Jenkins's Complaint fails to allege a violation of the Free Speech Clause.  Framed as a retaliation claim, plaintiff fails to state a claim because the Free Speech Clause does not protect speech expressed in an admissions interview from admissions consequences in a competitive process, *i.e.*, denial of admission based on the content or viewpoint expressed.  *See*, *e.g.*, *Finley*, 524 U.S. at 585-86; *Stearns*, 679 F. Supp. 2d at 1097. Framed as a challenge to CCBC's admissions criteria, plaintiff fails to state a claim because the Free Speech Clause does not prohibit CCCB from taking into consideration the content or viewpoint of an applicant's speech when deciding which candidates to admit to a competitive educational training program.  *Id.*  Moreover, even assuming the Free Speech Clause provides special protection in the admissions context for speech on a matter of public concern, the Complaint fails to state a claim for relief because Jenkins's speech did not involve a matter of public concern.  *See* ECF 26 at 14; *Durham*, 737 F.3d at 300.

## 2. Count II (Establishment Clause)

### a. Hostility to Religion

"The First Amendment states that 'Congress shall make no law respecting an establishment of religion,' U.S. Const. amend. I, and the Supreme Court has applied this principle against the states through the Fourteenth Amendment, *see Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947)."  *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012).

The Supreme Court has famously said that the basic purpose of the Establishment Clause is to "erect 'a wall of separation between Church and State.'"  *Everson*, 330 U.S. at 15-16 (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878) (quoting Thomas Jefferson)).  *See also Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) ("The first of the two [religion] Clauses [in the First Amendment], commonly called the Establishment Clause, commands a separation of church and state.").  The Court has also recognized, however, that "[i]nteraction between church and state is inevitable," and has "always tolerated some level of involvement between the two." *Agostini v. Felton*, 521 U.S. 203, 233 (1997); *accord*, *e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 683-84 (2005) ("One face [of the Clause] looks to the past in acknowledgment of our Nation's heritage, while the other looks to the present in demanding a separation between church and state.  Reconciling these two faces requires that we neither abdicate our responsibility to maintain a division between church and state nor evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage … .").  Indeed, in *Everson*, 330 U.S. at 18, the Court determined that the Clause essentially "requires the state to be a neutral in its relations with groups of religious believers and non-believers; *it does not require the state to be their adversary*."  (Emphasis added).  Accordingly, the Court determined that a State law that funded bus transportation to school for all children, including those who attended parochial schools, did not "breach" the proverbial wall.  *Id.*

Five years after *Everson*, in *Zorach v. Clauson*, 343 U.S. 306, 312 (1952), the Court said:

> There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment.  … The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State.  Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other.  … Otherwise the state and religion would be aliens to each other—

hostile, suspicious, and even unfriendly. … Policemen who helped parishioners into their places of worship would violate the Constitution.

The Court concluded that a municipal program that allowed public school students to leave school grounds during the school day, in order to "go to religious centers for religious instruction or devotional exercises," did not violate the Establishment Clause by supporting or endorsing religious instruction. *Id*. at 308-09. The Court reasoned, *id*. at 313-14 (emphasis added):

> When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. *To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe.* … [W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.

Eleven years later, in *Schempp*, *supra*, 374 U.S. at 205, Edward Schempp, a Unitarian, challenged, under the Establishment Clause, a state law that required that "[a]t least ten verses from the Holy Bible" be read "without comment, at the opening of each public school on each school day." A child could be excused from the reading "upon the written request of his parent or guardian." *Id*. The Court also simultaneously decided a companion case, *Murray v. Curlett*, 228 Md. 239, 179 A.2d 698 (1962), in which other parents, who were "professed atheists," challenged a rule promulgated by the Board of School Commissioners of Baltimore City that also required prayer readings each morning in public schools. 374 U.S. at 211-12. The Court struck down both laws, reasoning that they "require religious exercises and such exercises are being conducted in direct violation of the rights of the appellees and petitioners." *Id*. at 224.

- 47 -

The Court observed: "It is insisted that unless these religious exercises are permitted a 'religion of secularism' is established by the schools." *Id.* at 225.  Citing *Zorach*, *supra*, 343 U.S. 306, the Court stated:  "We agree of course that the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe.'  We do not agree, however, that this decision in any sense has that effect." *Id.*

*Epperson v. Ark.*, 393 U.S. 97, 103-04 (1968), is also noteworthy.  There, the Court said: "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice.  It may not be hostile to any religion or to the advocacy of no religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite.  The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Accord McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005).  Thus, as argued by plaintiff in his Opposition, in *Everson*, *Schempp*, and other cases, the Supreme Court established the principle that the Establishment Clause "'requires the state to be a neutral in its relations with groups of religious believers and non-believers,'" meaning that "while the government is prohibited from endorsing a particular religion, it is also barred from establishing a 'religion of secularism' by 'showing hostility to religion.'"  ECF 26 at 23 (citations omitted).

In other words, the Establishment Clause does not require the government to stand as an "adversary" toward religion, *Everson*, 330 U.S. at 18, nor does it permit the government, under the guise of compliance with the Establishment Clause, to express "hostility toward religion," because that would establish a preference for "'those who believe in no religion over those who

do believe.'" *See Schempp*, 374 U.S. at 225 (quoting *Zorach*, 343 U.S. at 313).  A government

preference for non-believers over believers would be tantamount to establishing a "religion of

secularism," in violation of the Establishment Clause.  *Id.*; *see also Linnemeir v. Bd. of Trustees*

*of Purdue Univ.*, 260 F.3d 757, 765 (7th Cir. 2001) (Posner, J.) (reasoning "that a public

university that had a *policy* of promoting atheism, or Satanism, or secular humanism, or for that

matter Unitarianism or Buddhism, would be violating the religion clauses of the First

Amendment") (emphasis in original); *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224

F.3d 283, 287 (4th Cir. 2000) ("[T]he prohibition against the establishment of religion does

require government neutrality toward religion and among religions.").

    If a preference for a particular religion or for "nonreligion" is facially apparent, strict

scrutiny applies.  *See Larson*, 456 U.S. at 244 (stating that "the clearest command of the

Establishment Clause is that one religious denomination cannot be officially preferred over

another" and applying strict scrutiny to State law).   If the alleged preference is not facially

apparent, however, the general test for violation of the Establishment Clause, established in

*Lemon v. Kurtzman*, 403 U.S. 602 (1971), applies.  *See Hernandez v. Comm'r of Internal*

*Revenue*, 490 U.S. 680, 695 (1989) ("*Larson* teaches that, when it is claimed that a

denominational preference exists, the initial inquiry is whether the law facially differentiates

among religions.  If no such facial preference exists we proceed to apply the [*Lemon* test].");

*accord Liberty Univ.*, *Inc. v. Lew*, 733 F.3d 72, 102 (4th Cir.) ("[T]his exemption makes no

'explicit and deliberate distinctions' between sects, *Larson*, 456 U.S. at 246 n. 23, and so is

subject only to the *Lemon* test."), *cert. denied*, —— U.S. ——, 134 S. Ct. 683 (2013); *Mellen v.*

*Bunting*, 327 F.3d 355, 370-76 (4th Cir. 2003) ("During the past decade, we have emphasized

that the *Lemon* test guides our analysis of Establishment Clause challenges."), *cert. denied*, 541

U.S. 1019 (2004).

### b. The *Lemon* Test

In *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012), the

Fourth Circuit described the *Lemon* test as follows:   "To pass muster under the Establishment

Clause, government conduct (1) must be driven in part by a *secular purpose*; (2) must have a

*primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle*

church and State."   (Emphasis in *Moss*).

Here, Jenkins does not argue that defendants' actions facially evince a preference for

nonreligion over religion, or that strict scrutiny should apply to their decision.   *See* ECF 26 at 23.

Rather, Jenkins argues that he alleges a claim for relief under the *Lemon* test.   *Id*. at 23-27.   I

agree that the *Lemon* test applies.   *Compare Larson*, 456 U.S. at 246 (applying strict scrutiny to

law that facially distinguished between religious sects) *with  Gillette v. United States*, 401 U.S.

437, 454, 441 (1971) (applying lesser scrutiny to regulation that "focused on individual

conscientious belief, not on sectarian affiliation," although the regulation expressly exempted

from military service persons who "by reason of religious training and belief … opposed … war

in any form"); *see also Liberty Univ., Inc.*, 733 F.3d at 102; *Farnan v. Capistrano Unified Sch.*

*Dist.*, 654 F.3d 975, 985 (9th Cir. 2011) ("Even statements exhibiting some hostility to religion

do not violate the Establishment Clause if the government conduct at issue has a secular purpose,

does not have as its principal or primary effect inhibiting religion and does not foster excessive

government entanglement with religion.").   And, I agree that Jenkins has alleged sufficient facts

to state a claim for relief because, given the posture of the case, I cannot determine whether defendants acted with an impermissible purpose.

The purpose prong of the *Lemon* test asks "'whether [the] government's actual purpose is to endorse or disapprove of religion.'" *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984)); *accord Mellen*, 327 F.3d at 372. It "presents a fairly low hurdle, which may be cleared by finding a plausible secular purpose … ." *Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (citation omitted). The Court need not find the purpose to be "exclusively secular." *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir. 2001) (quoting *Lynch*, 465 U.S. at 681 n.1). Plaintiff maintains that defendants had no secular purpose in excluding him from the RPT. ECF 26 at 23.

Although courts should be "normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 587 (1987) (rejecting State's "stated purpose … to protect academic freedom" where "[t]he goal of providing a more comprehensive science curriculum is not furthered either by outlawing the teaching of evolution or by requiring the teaching of creation science"); *see also*, *e.g.*, *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268-73 (4th Cir. 2005) ("A legitimate secular purpose is thus sufficient to pass muster under the first prong of the *Lemon* test, unless the alleged secular purpose is in fact pretextual."). The test is "not a pushover for any secular claim." *McCreary Cnty.*, 545 U.S. at 865, 871 (rejecting "new statements of purpose … presented only as a litigating position"). "The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable

official act." *Id.* at 862.  This objective observer is "presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *Id*. at 866.

Here, Jenkins contends in his Opposition that "Dougherty's reaction to Mr. Jenkins's [interview response referencing God] shows a preference against, and even hostility toward, his beliefs and religion in general, negating any secular purpose." ECF 26 at 24.  He argues that her instruction "to silence his personal beliefs in the future clearly has the purpose of compromising a student's belief," *id.* (citation omitted), and that defendants "did not use neutral criteria in determining who should be accepted to their program." *Id.* at 26.  In his view, defendants "do not even attempt to point the Court to any" secular purpose. *Id.* at 24.

It is true that defendants do not specifically address the purpose prong in their Memo, or the *Lemon* test at all.[12]  Indeed, defendants devote one page of argument in their Memo to Count II.  ECF 23-1 at 21.  They argue, in short, that "the contents of the Complaint … show that Defendants did exactly what the Establishment Clause requires." *Id*.  They point out that Jenkins alleges that the interview panelists "'did not follow up with further questions regarding Mr. Jenkins's religious beliefs'" when he said that "'[His] God' was the most important thing to him." *Id*.  And, defendants explain that "Defendant Dougherty advised [plaintiff] 'to leave [his] thoughts and beliefs out of the interview process' because participants in CCBC's Radiation Therapy Program treat patients 'from many different religions and some who believe nothing at all.'" *Id*. (quoting Dougherty Chain, ECF 9); *see also* ECF 1 ¶ 35 (quoting same).  Defendants conclude that Jenkins's "non-selection for the Program did not 'establish' anything.  Dr.

---

[12] Although defendants do not expressly address whether or how the *Lemon* test applies, they do cite the pages of *Glassman*, 628 F.3d at 146-49, that apply the *Lemon* test, in support of their contention that they "did exactly what the Establishment Clause requires." ECF 23-1 at 21.

Dougherty was not favoring one religion or another, nor was she disfavoring religion in general." ECF 23-1 at 21.

At this stage, my review is confined to the factual allegations in Jenkins's Complaint. *E.g. Clatterbuck*, 708 F.3d at 557. Defendants' Motion can be granted only if, taking as true plaintiff's factual allegations, and drawing all reasonable inferences in his favor, *see E.I. du Pont de Nemours & Co.*, 637 F.3d at 440, the Complaint does not allow the Court reasonably to infer more than the mere possibility of misconduct. *Iqbal*, 556 U.S. at 679; *A Society Without a Name*, 655 F.3d at 346. That is, if the Complaint plausibly alleges that defendants' actions had an entirely religious purpose or a purpose to favor nonbelievers, or, in other words, the actions lacked a secular purpose, it is not subject to dismissal. *E.g., Glassman*, 628 F.3d at 146; *see also McCreary Cnty.*, 545 U.S. at 860 (considering whether symbolic display had "predominantly religious purpose").

### c. Claims Against Dougherty and CCBC (via Dougherty in her Official Capacity)

Jenkins's Establishment Clause claim against Dougherty turns on the statement she sent to him in response to his email request for an explanation of the reasons why he was denied admission to the RTP. ECF 1 ¶ 35 (quoting Dougherty Chain, ECF 9 at 1); *see also* ECF 26 at 22, 25. In his Complaint, plaintiff quotes what Dougherty wrote, ECF 1 ¶ 35.

> "I understand that religion is a major part of your life and that was evident in your recommendation letters, however, this field is not the place for religion. We have many patients who come to us for treatment from many different religions and some who believe in nothing at all. If you interview in the future, you may want to leave your thoughts and beliefs out of the interview process."

On its face, Dougherty's statement expresses neutrality as between believers and nonbelievers; Dougherty stated that "this field is not the place for religion." That statement was

immediately followed by this one:  "We have many patients who come to us for treatment from many different religions and some who believe nothing at all."  ECF 9 at 1.  Standing alone, no one could reasonably infer that the second sentence expressed hostility toward believers or nonbelievers, or a preference for either.  And, in context, because the first statement comes immediately before the second, neutral statement, a reasonable inference about the relationship between the two is that the radiation "field is not the place for religion" *because* the field "has many patients who come … for treatment from many different religions and some who believe in nothing at all."  *Id.*  Taken together, these statements evince no preference for admission of believers or nonbelievers; rather, they express a preference for applicants who do not speak about their beliefs in an admissions interview or in "the field," whatever those beliefs may be.  That is certainly a neutral statement as between believers and nonbelievers.

Jenkins's broader CCBC-policy/criteria claims turn on CCBC's official support of Dougherty's statement.  In its response through counsel to Jenkins's Demand Letter (ECF 9-3), CCBC states, for example, ECF 9-2 at 5-6 (emphasis on portions quoted in ECF 1 ¶¶ 51-53):

> As only one part of her answer, which was not intended to be comprehensive and legally all encompassing, Dr. Dougherty explained that the radiation therapy field of medicine is not faith-based and that Mr. Jenkins would be expected to work with patients of all different faiths or no faith at all.  *Mr. Jenkins's reliance for motivation upon his religious beliefs during the interview was not the best answer to the motive question*.  Dr. Dougherty advised Mr. Jenkins that "[i]f you interview in the future, you may want to *leave your thoughts and beliefs out of the interview process*."  *Stated bluntly*, that *is not bad advice*.  As your organization knows, … public schools such as CCBC are prohibited from considering a candidate's religious beliefs, favorably or unfavorably, in selecting finalists for its programs.  Mr. Jenkins was not advised to ignore, change, or deny his religious views.  The suggestion was simply that he *not wear* them *on his sleeve* as his best qualification.

***

> … Dr. Dougherty tried to provide Mr. Jenkins advice to refocus his interests to help him succeed.  Her *words may have been inartfully stated*, but *the fact is that in any secular job or program interview it is better to have a concrete reason for wanting to undertake the training at hand than to say only that God directed one to do it.  That is true for every job from astronaut to attorney*.

CCBC's Response defended Dougherty and framed her words as "explain[ing] that the radiation therapy field of medicine is not faith-based and that Mr. Jenkins would be expected to work with patients of all different faiths or no faith at all."  ECF 9-2 at 5.  As indicated, in the next sentence, CCBC stated: "Mr. Jenkins's reliance for motivation upon his religious beliefs during the interview was not the best answer to the motive question."  *Id.* at 6.  Again, it is a reasonable inference that defendants believed "Mr. Jenkins's reliance for motivation upon his religious beliefs during the interview was not the best answer to the motive question" *because* "the radiation therapy field of medicine is not faith-based and … Mr. Jenkins would be expected to work with patients of all different faiths or no faith at all."

Again, this can be construed as a neutral, secular purpose for defendants' decision.  One can infer a concern that expressions of religious belief, like Jenkins's expressions, would not be appropriate in the field of Radiation Therapy because those jobs involve interaction with patients with varied belief systems, who may be uncomfortable responding to similar religious expression, and that this might hinder his job prospects or performance.  Therefore, Mr. Jenkins's decision to express his religious beliefs in the interview was not "the best answer to the motive question."  In other words, Jenkins's response could have prompted a concern on Dougherty's part as to whether Jenkins understood that he would be involved in the medical care of people who might not share his religious views, and who might not welcome such comments.  Nevertheless, in her email to Jenkins, Dougherty offered to put Jenkins in touch with the director

of CCBC's mental health program, for which Dougherty said Jenkins would be "a great candidate" based on his "background, current working environment," and his recommendation letters. ECF 9 at 1.  Dougherty's willingness to refer Jenkins to another CCBC program that she apparently believed would better fit with his credentials does not comport with an argument that she denied him admission to the RTP solely or predominantly because she wished to communicate disapproval of religious beliefs or believers in general and approval of nonbelievers.

Moreover, defendants assert a plainly neutral, secular reason for their decision not to admit Jenkins.  They state that Jenkins "was not selected for the 2013 Radiation Therapy Program because other candidates were better qualified."  CCBC Response, ECF 9-2 at 1.  They explain that Jenkins's grade of "C" in Physics "caused [him] to score low in the GPA assessment category," and "was a significant reason" for his nonselection, and "it remains a serious concern."  *Id*. at 2.  They add that "Mr. Jenkins did not score high on content or ability to follow directions" with regard to the writing and critical thinking component of process.  *Id*.  And, Jenkins's description of his "learning style" in the interview did "not foster confidence that Mr. Jenkins would be successful in the highly self-directed" RTP, because Jenkins "explained that he had to stay after every class with his math teacher to get help."  *Id.* at 3.

However, Jenkins alleges that defendants "have used shifting justifications as a pretext to conceal improper and unlawful motives."  ECF 1 ¶ 62; *see also id.* ¶ 64.  In particular, he asserts that "Defendant Dougherty's reasoning" in her email to him is "inconsistent with prior communications Mr. Jenkins had with her."  *Id.* ¶ 40.  He states that he spoke with her "[e]arly in the admission process" about "whether a single criminal charge he received more than ten (10)

years ago would interfere with his ability to obtain a job following completion of the" RTP. *Id.* ¶ 41. He claims that at "that time, Defendant Dougherty … assured Mr. Jenkins that any uncertainty regarding his ability to obtain a job in Maryland would *not* be a reason not to accept him into the program." *Id.* ¶ 43 (emphasis in original). Moreover, he states that "neither … his past nor Mr. Jenkins's willingness to work outside the State of Maryland" after completion of the RTP "were raised in the admissions interview." *Id.* ¶ 38.[13] And, plaintiff believes that Dougherty's offer, at the end of her email, to put him in contact "with a director of another department/program that might be more suitable for him," is also inconsistent with her prior statements. *Id.* ¶ 44.

Again, in the present posture of this case, I must accept Jenkins's factual allegations as true and draw all reasonable inference in favor of plaintiff's claim. If it is true that "early in the admissions process" Dougherty "assured" Jenkins that uncertainty regarding his job prospects in Maryland would "*not* be a reason not to accept him into the program," then her later, apparent reliance on just that uncertainty as a partial reason for his rejection is, as Jenkins says, "puzzling." ECF 1 ¶ 38. To be sure, one can reasonably infer from defendants' statements a secular concern that Jenkins's readiness and apparent desire to speak about his faith would not be regarded as appropriate in the radiation therapy field, and thus might hinder his job prospects on graduation. On the other hand, in light of Dougherty's "inconsistent … communications," *id.* ¶ 40, one might also reasonably infer that this concern was pretext for an actual purpose, borne of animosity to religion in general, or perhaps to suppress discussion of religious beliefs in the field and/or in CCBC's clinical program. Similarly, although defendants argue that Jenkins was not

---

[13] Jenkins does allege that he was asked in his interview if he "*preferred* to stay in Maryland," and that he answered "yes." ECF 1 ¶ 38.

selected simply because other candidates were better qualified, at this stage, I cannot credit that assertion as true.

Finally, I note that defendants also stress their view that Jenkins alone injected religion into the admissions process.  In their Memo, they describe the facts as showing that it was Jenkins who "introduced his religion into the selection process," and then "sought and received" an "honest piece of advice."  ECF 23-1 at 11-12.  In their Reply, defendants argue that the "Opposition Argument Depends Upon a Legal Absurdity."  ECF 27 at 8.  They state:  "The core of the argument advanced by Mr. Jenkins in the Memorandum is that he may submit letters describing his religious values, employ religion to answer secular questions, and otherwise inject religion into the application process for a Radiation Therapy Program, but College officials had better not mention Mr. Jenkins's religion in any way."  *Id*. at 8-9.  They contend that "this would be a different case" if CCCB "had asked Mr. Jenkins about his religious beliefs, or pursued data about his religion in any regard … ."  *Id*. at 9.

On the face of the Complaint, it is clear that plaintiff introduced his religion into the selection process, and, further, that he now complains about statements he himself solicited from Dougherty.  However, if it is true that a preference for "nonreligion," or for "nonreligious" candidates, did actually cause Dougherty to deny Jenkins admission to the RTP, the fact that Jenkins brought up religion first would not excuse the impermissible act.  Such a decision would still be an unconstitutional preference under the Establishment Clause.

Accordingly, in light of the posture of the case, plaintiff's factual allegations in support of his claim of pretext are sufficient as to the contention that Dougherty, in her individual and official capacities, acted with an impermissible purpose.  *See*, *e.g.*, *Lambeth*, 407 F.3d at 270

(affirming dismissal of plaintiff's Complaint, on motion to dismiss, where it "fail[ed] to allege" that the challenged action "was a pretext for religious motivations, and thereby fail[ed] to allege that there was no legitimate secular purpose" for the action). Therefore, with regard to Count II, the Motion is denied as to Dougherty, in her individual and official capacities.

### d. Claims Against Remaining Defendants

The same analysis does not apply to Jenkins's claims against defendants Kurtinitis, McColloch, and Lilley (collectively, the "Supervisors"), which are brought against them in both their individual and official capacities. Defendants argue that all of Jenkins's claims against the Supervisors must be dismissed because he "fails to allege any facts showing that" they "were individually responsible for Mr. Jenkins's non-selection." ECF 23-1 at 26.

A § 1983 claim, as here, requires "that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Thus, to state a § 1983 claim against a defendant in her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. A plaintiff cannot maintain a § 1983 cause of action under a *respondeat superior* theory. *Id.* However, in certain circumstances, "supervisory officials may be held liable ... for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994).

"In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show" the following three elements, *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw*, 13 F.3d at 799) (alterations in *Wilkins*):

(1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

In *Wilkins*, the Fourth Circuit reiterated the *Shaw* Court's explication of the elements as follows, *Wilkins*, 751 F.3d at 226-227 (quoting *Shaw*, 13 F.3d at 799) (alterations in *Wilkins*) (citations omitted):

As to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."  As to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Finally, as to the third element, "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions."

Plaintiff argues that supervisory liability applies to each of the Supervisors here because they "were each informed of Defendant Dougherty's unconstitutional actions," ECF 26 at 32, and thereby put "on notice that the constitutional injury may not be limited to Mr. Jenkins." *Id.* at 33.  Further, their "responses to the boldly stated policy of Defendant Dougherty were, without dispute, inadequate and demonstrative of tacit approval." *Id.*  Specifically, plaintiff argues that Lilley "utterly ignored Mr. Jenkins constitutional injury" by not responding to an email Jenkins sent him detailing his concerns. *Id.* (citing ECF 1 ¶¶ 46-57). He argues McColloch "refused to properly investigate the matter" and "inexplicably concluded … that 'religion was not a factor in

any decision regarding [Mr. Jenkins's] course of study at CCBC.'"  *Id.* (quoting ECF 1 ¶ 48).

Jenkins bases his allegation against McColloch on the text of an email he received from Miriam

Milsom, a Human Resources official at CCBC, ECF 1 ¶ 45, in which she stated, ECF 9-1 at 1:

> I wanted to let you know that I discussed your complaint with the Vice President
> of Instruction, Mark McColloch.  We reviewed the documentation to which you
> referred.  I can assure you that your religion was not a factor in any decision
> regarding your course of study at CCBC.

Jenkins's arguments in support of his claim against Kurtinitis are based entirely on

statements made in CCBC's Response to Jenkins's Demand Letter.  *See* ECF 26 at 34; ECF 1 ¶

49.  As Jenkins explains in his Complaint, ECF 1 ¶ 50, CCBC's Response was sent "by and

through its attorney."  *See* ECF 9-2.  It is signed only by Peter S. Saucier, Esq., and is under the

letterhead of the law offices of Kollman & Saucier, P.A., with "The Community College of

Baltimore County" listed as a carbon copy recipient.  *Id.* at 1, 6.  There is no mention of

Kurtinitis in CCBC's Response.  *Id.* at 1-6.

Jenkins concludes that "the causal link between the inaction and/or approval of" the

Supervisors "and the constitutional injury … is clearly alleged" by the facts that each defendant

"was aware" of the injury "at a time when he or she could have taken corrective action, but each

chose not to do so."  ECF 26 at 34.

Plaintiff's claims against the Supervisors must be dismissed.  As an initial matter, the

Complaint does not actually allege that any of them acted as Dougherty's supervisors, or that,

more to the point, any of them could overturn the admissions decision at issue.  *See generally*

ECF 1.  He does allege that they each acted to "uphold" the decision.  *E.g.*, *id.* ¶ 61.  But, it is not

obvious that Lilley, who served as Vice President of Student Services, *id.* ¶ 46, or McColloch,

who served as Vice President of Instruction, *id.* ¶ 48, had any responsibility to oversee

Dougherty's work or any authority to overturn admissions decisions.  Presumably Kurtinitis, as President of CCBC, *id.* ¶ 49, could have somehow intervened.  But, plaintiff's "Captain of the Ship" argument is not sufficient to state a claim.

Even assuming that the Supervisors supervised Dougherty and/or admissions decisions, and that they were made aware of what occurred, their knowledge, after the fact, is not sufficient to constitute "tacit authorization."   Under *Shaw*, plaintiff must also allege facts supporting an inference that the unconstitutional "'conduct is widespread, or at least has been used on several different occasions.'"  *Wilkins*, 751 F.3d at 226 (quoting *Shaw*, 13 F.3d at 799); *see also*, *e.g.*, *Randall v. Prince George's Cnty.*, 302 F.3d 188, 207 (4th Cir. 2002).   Here, there are no allegations in the Complaint that Dougherty, or anyone else under the Supervisors' supervision, engaged in "conduct" similar to the allegations described on any other occasion.   There are no facts showing that the "conduct is widespread" or was "used on several different occasions." Indeed, there is nothing even remotely close to sufficient factual support for such an allegation.

Jenkins's claims against Lilley, McColloch, and Kurtinitis in their individual capacities must therefore be dismissed, with prejudice.

With regard to Jenkins's official capacity claims against the Supervisors, as discussed, *supra*, these are in effect claims against CCBC itself.   *See Graham*, 473 U.S. at 165; *Huggins*, 683 F.3d at 532.   Because I have already determined that the Complaint states a claim for relief against Dougherty, in both her individual and official capacities, any claims against other defendants in their official capacities are merely duplicative of the claim already alleged against CCBC via Dougherty in her official capacity.   Accordingly, I will also dismiss Jenkins's claims against Lilley, McColloch, and Kurtinitis in their official capacities.

### C. Count III - Article 36 of the Maryland Declaration of Rights (Religious Freedom)

In their Memo, defendants argue that Jenkins's Count III allegations must be dismissed for three reasons.  First, defendants argue that plaintiff has failed to comply with the Maryland Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol.), § 5-304(a) of the Courts & Judicial Proceeding Article ("C.J.").  ECF 23-1 at 22-23.  Second, they argue that Jenkins's State claim is indistinguishable from his federal claims, and should be dismissed for the same reasons.  *Id*. at 22.  Finally, they argue that Maryland law does not provide a private right of action for damages under Article 36.  *Id*.

### 1. LGTCA

"'It is a longstanding principle of Maryland jurisprudence that the LGTCA notice provision is a condition precedent to maintaining an action directly against a local government or its employees.'"  *Rounds v. Md.-Nat. Capital Park & Planning Comm'n*, ── Md. ──, No. 19, Sept. Term 2013, 2015 WL 402076, at *7 (Jan. 29, 2015) (quoting *Hansen v. City of Laurel*, 420 Md. 670, 682, 25 A.3d 122, 130 (2011)).  The LGTCA generally applies, *inter alia*, to "claims seeking redress for government violations of the state constitution where unliquidated damages are sought."  *Rounds*, 2015 WL 40276, at *6.  The "purpose of the notice requirement is 'to apprise a local government of its possible liability at a time when it could conduct its own investigation, i.e., while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it.'"  *Id*. at * 7 (quoting *Prince George's Cnty. v. Longtin*, 419 Md. 450, 466, 19 A.3d 859, 869 (2011)) (additional citation omitted).

In their Memo, defendants state that "CCBC is defined as 'local government' for purposes of the LGTCA," citing C.J. § 5-301(d)(9).  ECF 23-1 at 22.  Under C.J. § 5-301(d)(9), the term "local government" is defined to include a "community college or board of trustees for a community college established or operating under Title 16 of the Education Article … ."  And, CCBC appears to "operat[e] under" Title 16 of the Education Article ("Educ.").  *See* Md. Code (2008 Repl. Vol.), EDUC. § 16-105 (establishing different provisions relating to President of CCBC from those applicable to other community colleges).

The LGTCA provides, in relevant part, as follows, C.J. § 5-304:

(b) *Notice Required.*— (1) Except as provided in subsection[ ] ... (d) of this section, an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury.

> (2) The notice shall be in writing and shall state the time, place, and cause of the injury.

(c)(1)  The notice required under this section shall be given in person or by certified mail ... by the claimant or the representative of the claimant.

> \*\*\*

> (3) If the defendant local government is:

> \*\*\*

>> (iii)  … Baltimore County, … the notice shall be given to the county solicitor or county attorney.

> (4) For any other local government, the notice shall be given to the corporate authorities of the defendant local government.

(d) *Waiver of notice requirement.*—Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given.

Citing C.J. § 5-304(c)(3)(iii), defendants state that, "[i]n Baltimore County, notice must be provided to the county attorney."  ECF 23-1 at 22-23.  As stated above, § 5-304(c)(3)(iii) applies if "the local government defendant is … Baltimore County … ."  Defendants do not dispute that plaintiff sent a Demand Letter to CCBC President Kurtinitis.  *See* ECF 9-3.  The Demand Letter was addressed to Kurtinitis (and Dougherty) and stated that it was sent via certified mail and email.  *Id.* at 1.  Therefore, plaintiff did not comply with C.J. § 5-304(c)(3)(iii).

On the other hand, the Demand Letter is dated June 28, 2013, which was well within 180 days of Jenkins's alleged injury, *i.e.*, CCBC's denial of admission "on or about April 19, 2013." *See* ECF 1 ¶ 28.  It also states the "time, place, and cause of the injury," *see* § 5-304(b)(2), sets out plaintiff's basic legal theory, and unambiguously states that plaintiff's counsel would "advise [its] client of his right to bring suit in federal court" if CCBC did not admit Jenkins to the RTP by July 18, 2013.  ECF 9-3 at 1- 7.  Moreover, it is difficult to discern any prejudice based on notice to Kurtinitis, rather than the County Attorney, given that the notice must have reached the proper person.

If defendants believe that plaintiff has not, at least, "substantially complied" with the LGTCA, they may so argue at a later stage in this litigation.  *See, e.g., Hous. Auth. of Baltimore City v. Woodland*, 438 Md. 415, 428-29, 92 A.3d 379, 387 (2014) (citation and alteration omitted) ("As we recently explained, a plaintiff satisfies substantial compliance where: (1) The plaintiff makes some effort to provide the requisite notice; (2) the plaintiff does in fact give some kind of notice; (3) the notice provides ... requisite and timely notice of facts and circumstances giving rise to the claim; and (4) the notice fulfills the LGTCA notice requirement's purpose, which is to apprise the local government of its possible liability at a time when the local

government could conduct its own investigation, *i.e.*, while the evidence was still fresh and the recollection of the witnesses was undiminished by time, sufficient to ascertain the character and extent of the injury and the local government's responsibility.").

### 2. Private Right of Action for Damages Under Article 36

Defendants also argue that Count III should be dismissed, in part, because "Maryland law does not provide a private right of action for damages under Article 36 … ."  ECF 23-1 at 22. They cite one case:  *Baird v. Haith*, 724 F. Supp. 367, 384 (D. Md. 1988).  In *Baird*, 724 F. Supp. at 384, the court stated: "The Court will dismiss [Count V, alleging violation of Article 36] against the defendants in both their official and individual capacities on the grounds that there is no indication in Maryland law that there is any private right of action for damages under this Article."  The court provided no other discussion, and no authority for its conclusion.

In his Opposition, plaintiff argues:  "[The District of Maryland] has admitted that while there is confusion regarding whether Article 36 … provides a private cause of action for damages, Maryland courts have repeatedly decided cases on the assumption that the provision … is 'in pari materia with the First Amendment,' and as such, have proceeded 'on the basis that … the two constitutional provisions are the same.'"  ECF 26 at 27 (quoting *Booth v. Md. Dep't of Pub. Safety & Corr. Servs.*, RDB-05-01972, 2008 WL 2484937, at *8 (D. Md. June 18, 2008)).  In *Booth*, Judge Bennett stated that he had previously determined that, *id.* (emphasis in original):

> "Defendants have not presented sufficient grounds for concluding that Article 36 of the Maryland Declaration of Rights does *not* give rise to a private cause of action." (Mem. Op. 11).  Noting that "Maryland law is unclear on this point," this Court stated that "neither party has undertaken anything more than a cursory analysis with respect to whether Article 36 authorizes a private cause of action" and that an appropriate analysis would "consider, among other topics, whether Article 36 is self-executing, establishes individual rights, imposes a duty on the government, and provides an express remedy." (*Id.* at 11–12.)

The court then proceeded to dismiss plaintiff's Article 36 claim because it had already dismissed plaintiff's claim under the Free Exercise Clause of the federal Constitution, which plaintiff's counsel "conceded" was not meaningfully different from his claim under Article 36. *Id.* The court did not decide whether Article 36 provides a private right of action, for damages or otherwise. *Id.*

As in *Booth*, defendants have "not presented sufficient grounds for concluding that Article 36 … does *not* give rise to a private cause of action" for damages. *Id.* at *8. And, because Jenkins argues that his Article 36 claim is essentially the same as his Establishment Clause claim, *see* ECF 26 at 28, I see no point in deciding the issue at this stage. The parties' discovery proceedings, for example, will not be affected. Accordingly, I will assume, without deciding, that Article 36 provides a private right of action for damages.

### 3. Failure to State a Claim

Defendants also argue that Jenkins's third Count is "a restatement of his Count I First Amendment free speech allegations," and that, under Maryland law, it is "subject to the same analysis as First Amendment claims under the Federal Constitution." ECF 23-1 at 22. Therefore, they argue, Count III fails to state a claim for the same reasons as Count I, and the Court should dismiss it. *Id.*

 In his Opposition, plaintiff responds: "As Plaintiff has already outlined, *supra*, he has properly alleged sufficient facts to support a violation of his First Amendment rights under the Free Speech and Establishment Clauses. Accordingly, Plaintiff's claim against Defendants for violation of Article 36 … is properly supported and should proceed in the same manner as his First Amendment claims." ECF 26 at 28.

As I understand plaintiff's response in Opposition, he does not believe that his claims in Count III are substantively different than those in Count I or II, nor does he indicate that they should be considered under any other standards. *Id.* Consequently, at this stage, I will assume that plaintiff means to allege the same things in Count III, under the Maryland Declaration of Rights, as he alleges in Counts I and II under the federal Constitution.

It is not obvious to the Court how Article 36, which protects religious freedom, relates to plaintiff's claim under the Free Speech Clause of the federal Constitution. In any event, because I have determined that plaintiff fails to state a claim for relief in Count I, and the parties assert that Count III is not substantively different from Count I, any ostensible free-speech claim in Count III must also be dismissed, for failure to state a claim. However, because plaintiff stated a claim for relief under Count II against Dougherty, plaintiff's Establishment-Clause claim under Article 36 will not be dismissed as against Dougherty in her individual capacity.[14] But, Count III will be dismissed, as against Lilley, McColloch, and Kurtinitis, because plaintiff has failed to state a claim against them under Count II.[15]

### Conclusion

For the foregoing reasons, I will GRANT in part and DENY in part defendants' Motion (ECF 23).

I will DISMISS Count I, with prejudice, as against all defendants, in their individual and official capacities, for failure to state a claim.

---

[14] As discussed, *supra*, all of plaintiff's State claims against defendants in their official capacity must be dismissed, with prejudice, as they are barred by the Eleventh Amendment.

[15] If, at a later stage, any party believes that the substantive protections of Article 36 differ from those under the Establishment Clause in a material way, the Court will of course consider that argument.

I will DENY the Motion as to Count II as against Dougherty, in her individual and official capacities.  However, because plaintiff's claim against Dougherty in her individual capacity is in effect a claim against CCBC, which is an agency of the State of Maryland, plaintiff may not recover monetary damages from Dougherty in her official capacity.

I will DISMISS Count II, with prejudice, as against defendants Lilley, McColloch, and Kurtinitis, in their individual and official capacities.  Count II is dismissed against them in their individual capacities for failure to state a claim.  Count II is dismissed against them in their official capacities because these claims are duplicative of plaintiff's claim against CCBC via defendant Dougherty in her official capacity.

I will DISMISS Count III, with prejudice, against all defendants in their official capacities, based on the Eleventh Amendment.

I will DENY the Motion as to Count III as against Dougherty in her individual capacity, to the extent that the claim alleges the same claim as Count II, but under State law rather than federal law.

A separate Order follows, consistent with this Memorandum.


Date: March 20, 2015                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge